EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Hon. José Aponte Hernández, Presidente de la Cámara de Representantes de Puerto Rico; y Hon. Rolando Crespo Arroyo, Presidente de la Comisión de Bienestar Social de la Cámara de Representantes | Certiorari |
| Recurridos | 2008 TSPR 53 |
| vs. | 173 DPR \_\_\_\_ |
| Hon. Roberto Sánchez Ramos, Secretario de Justicia; Sra. Marta Elsa Fernández, Secretaria Interina del Departamento de la Familia; Hon. Yolanda Zayas Santana, Exsecretaria del Departamento de la Familia | |
| Peticionarios | |

Número del Caso: CC-2006-828

Fecha: 31 de marzo de 2008

Tribunal de Apelaciones:

> Región Judicial de San Juan, Panel IV

Juez Ponente:

> Hon. José Miranda de Hostos

Oficina del Procurador General:

> Lcda. Sarah Y. Rosado Morales
> Procuradora General Auxiliar

Abogados de la Parte Recurrida:

> Lcdo. Richard W. Markus
> Lcdo. Manuel D. Herrero
> Lcdo. Luis A. Berríos Amadeo

Materia: Solicitud de citación y producción de expedientes confidenciales en casos de maltrato de menores

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Hon. José Aponte Hernández, Presidente de la Cámara de Representantes de Puerto Rico; y Hon. Rolando Crespo Arroyo, Presidente de la Comisión de Bienestar Social de la Cámara de Representantes<br>　　　　　Recurridos<br><br>　　　　　　　　v.<br><br>Hon. Roberto Sánchez Ramos, Secretario de Justicia; Sra. Marta Elsa Fernández, Secretaria Interina del Departamento de la Familia; Hon. Yolanda Zayas Santana, Ex secretaria del Departamento de la Familia<br>　　　　　Peticionarios | | *Certiorari*<br><br><br>CC-2006-828 |

SENTENCIA

En San Juan, Puerto Rico, a 31 de marzo de 2008.

Los peticionarios, el Secretario de Justicia Roberto Sánchez Ramos y el Secretario de Departamento de la Familia Félix Matos Rodríguez, ambos en su capacidad oficial, así como la ex Secretaria del Departamento de la Familia Yolanda Zayas Santana, impugnan la Sentencia que pronunció el Tribunal de Apelaciones el 5 de septiembre del 2006 revocando la determinación del Tribunal de Primera Instancia que había denegado un requerimiento de información dirigido por la Comisión de Bienestar Social de la Cámara de Representantes de Puerto Rico al Departamento

de la Familia y al Departamento de Justicia. A continuación relatamos los hechos pertinentes a la controversia que debemos resolver.

I

El 13 de septiembre del 2005 la Cámara de Representantes aprobó la Resolución núm. 2756, que ordena a la Comisión de Bienestar Social de la Cámara de Representantes de Puerto Rico, en adelante la Comisión, "a realizar una investigación en torno a los procedimientos seguidos por el Departamento de la Familia en el caso del niño Matthew Elías Amigo y sus hermanos". Según la Exposición de Motivos de dicha Resolución, "el lamentable deceso de este niño ha destapado una serie de sucesos que ponen en entredicho el trabajo del Departamento de la Familia y del Registro Demográfico de Puerto Rico". Así, la investigación tiene el propósito de "identificar las posibles acciones administrativas y legislativas que deban adoptarse" con relación a lo investigado. Bajo la autoridad conferida por la mencionada Resolución, y de acuerdo a los poderes conferidos a la Asamblea Legislativa por el artículo 31 del Código Político, 2 L.P.R.A. sec. 151, el 16 de septiembre de 2005 la Comisión le requirió a los Secretarios de ambos Departamentos "la reproducción y entrega de todos aquellos documentos, expedientes, e información que obre en poder" de dichos Departamentos relacionados al caso del niño Matthew Elías Amigo, sus hermanos y demás personas envueltas. La vista para

testificar y presentar documentos fue señalada para el 22 de septiembre de 2005.

El día de la vista, el Departamento de la Familia cursó una misiva al Presidente de la Comisión, el Representante Rolando Crespo Arroyo, en la cual adujo que el artículo 26 de la Ley número 177 del 1 de agosto del 2003, mejor conocida como la Ley para el bienestar y la protección de la niñez, 8 L.P.R.A. sec. 446e, establecía la confidencialidad de los expedientes solicitados, por tratarse de expedientes generados en la ejecución de la citada ley. El Departamento de la Familia arguyó además que la Ley núm. 177, en su artículo 27, 8 L.P.R.A. sec. 446f, era muy específica al enumerar las personas con derecho a tener acceso a los expedientes y las circunstancias en las cuales se autorizaba dicho acceso, pues el interés en su confidencialidad era de gran magnitud. También aclaró que las excepciones a la confidencialidad de la Ley núm. 177 tampoco garantizaban la entrega de los expedientes. El Departamento alegó que la Resolución que autorizaba la investigación de la Comisión era defectuosa, puesto que no le autorizaba literalmente a emitir citaciones para recibir documentos y expedientes. Por último, el Departamento manifestó que el caso del menor Matthew Elías Amigo se estaba dilucidando en el Tribunal de Primera Instancia[1] que había impuesto una "orden de mordaza" a las partes en el proceso, por lo que el

Departamento de la Familia no podía divulgar información alguna en cuanto a dichos procedimientos judiciales.

En la misma fecha, el Departamento de Justicia envió una carta al Presidente de la Comisión señalándole que de acuerdo a la Ley orgánica del Departamento de Justicia, específicamente su artículo 13, la información contenida en los expedientes solicitados era confidencial. Ley número 205 del 9 de agosto de 2004, 3 L.P.R.A. sec. 292j. Ello porque una ley, la Ley núm. 177, declaraba su confidencialidad en sus artículos 26 y 27. El Departamento de Justicia esbozó algunas de las doctrinas formuladas por este Tribunal sobre el tema del acceso a la información del ejecutivo para resaltar la constitucionalidad de las leyes citadas que establecen la confidencialidad de la información ejecutiva. Finalmente, el Departamento de Justicia indicó que el expediente del Ministerio Público estaba cobijado por el privilegio evidenciario establecido en la Regla 31 de las de Evidencia, 32 L.P.R.A. Ap. IV R. 31.

No obstante lo anterior, ambos Departamentos expresaron su disposición a cooperar con la Rama Legislativa para apoyar acciones legislativas adecuadas que tuvieran el fin de promover el bienestar de los menores en nuestra jurisdicción.

Ante la incomparecencia de los Secretarios de ambos Departamentos, la Comisión los citó a una vista ejecutiva a

---

[1] Departamento de la Familia v. William Elías Rodríguez,

ser celebrada el 5 de octubre de 2005. Asistieron a la vista ejecutiva la Lcda. Betsy Asencio Quiles, la Sra. Carmen Nazario y el Lcdo. Benjamín Rivalta en representación del Departamento de la Familia. La Lcda. Ana Garcés asistió en representación del Departamento de Justicia. Ninguno de ellos hizo entrega de la información requerida en los *subpœnas* y reiteraron las razones que brindaron sus jefes de agencia para explicar por qué estaban impedidos de proveer los expedientes.

Mediante comunicación escrita del 16 de noviembre de 2005 la Comisión apercibió a los Departamentos de la Familia y de Justicia que de no entregar los documentos solicitados en o antes del 28 de ese mes, se les encontraría incursos en desacato al amparo del artículo 34-A del Código Político, 2 L.P.R.A. sec. 154a. En dicha comunicación se particularizó la información requerida a ambos Departamentos. Al Departamento de la Familia se le requirió el historial del expediente del niño Matthew Elías Amigo y sus hermanos; el referido inicial del caso; evaluaciones psicológicas de los padres de los menores; evaluaciones psiquiátricas de los padres de los menores; evidencia escolar de los menores; toda documentación entregada por los padres de los menores y todos los requerimientos efectuados por el Departamento de la Familia a los padres de los menores. Por su parte, al Departamento de Justicia se le requirió la entrega del expediente del

---

Casos núm. NRSF2005-0372 y NRSF-2005-0355.

niño Matthew Elías Amigo y sus hermanos. Además se le ordenó reproducir mociones, órdenes, minutas y procedimientos de descubrimiento de prueba.

El 9 de febrero de 2006 la Comisión requirió nuevamente la asistencia de los peticionarios a otra vista ejecutiva para recibir su testimonio y los expedientes solicitados. El 17 de febrero de 2006 ambos Secretarios reiteraron sus posturas anteriores. Así las cosas, y de acuerdo al procedimiento establecido en el artículo 34-A del Código Político, el 22 de mayo de 2006 la Cámara de Representantes compareció ante el Tribunal de Primera Instancia por conducto de su presidente, el Representante José F. Aponte Hernández y del Representante Rolando Crespo Arroyo, presidente de la Comisión, en adelante los recurridos. Mediante *Petición Urgente* solicitaron al foro primario que citara a varios funcionarios de la Rama ejecutiva, entre ellos, el Secretario de Justicia, Roberto Sánchez Ramos, la entonces ex Secretaria del Departamento de la Familia, Yolanda Zayas Santana y a la Secretaria Interina de dicho Departamento, la Sra. Marta Elsa Fernández, a los efectos de que no sólo comparecieran a testificar, sino a entregar todos los documentos relativos al caso del niño Matthew Elías Amigo y sus hermanos.

El Tribunal de Primera Instancia concedió lo solicitado advirtiendo a los funcionarios y ex funcionaria citados que el poder de citación de la Asamblea Legislativa y la consecuente obligación de los citados a comparecer no

obsta la facultad de éstos para esgrimir cualquier reclamo de confidencialidad sobre los expedientes peticionados. El Tribunal concluyó que el reclamo de confidencialidad que puedan hacer los funcionarios "es distinto a la obligación de comparecer ante el cuerpo Legislativo a orientar a las Cámaras sobre el asunto en particular y/o a prestar testimonio que no esté sujeto a los reclamos válidos de confidencialidad." Según el *subpœna* emitido por el Tribunal de Primera Instancia, las partes debían comparecer ante la Asamblea Legislativa el 30 de mayo del 2006 bajo apercibimiento de desacato.

De esta determinación acudieron en reconsideración los peticionarios Roberto Sánchez Ramos, Yolanda Zayas Santana y la entonces Secretaria Interina del Departamento de la Familia Sra. Marta Elsa Fernández. Adujeron varios argumentos sobre la naturaleza ex parte de la citación emitida por el Tribunal de Primera Instancia que por no ser pertinentes a la controversia no esbozaremos. Reprodujeron sus alegaciones sobre la improcedencia de los requerimientos de información a base de la Ley núm. 177 y la Regla 31 de las de Evidencia. También alegaron que constituía una violación a la doctrina de separación de poderes el que la Asamblea Legislativa, a través de una de sus comisiones, determinara cuáles de los funcionarios del Ejecutivo debían comparecer ante dicho cuerpo a representar la posición institucional de la agencia. Según los peticionarios, le corresponde al Ejecutivo determinar quién

debe comparecer ante la Asamblea Legislativa, a menos que se cite a determinada persona en calidad de testigo con conocimiento personal de unos hechos particulares, cosa que según los peticionarios no se colige del *subpœna* en cuestión. Finalmente, los peticionarios dijeron haber comparecido a la vista ejecutiva del 5 de octubre del 2005, por lo cual no procedía que se les citara bajo apercibimiento de desacato.

El Tribunal de Primera Instancia acogió los planteamientos de los peticionarios. En su Sentencia resolvió que la citación personal de los jefes de agencia es improcedente, puesto que ésta va dirigida a que se exponga la posición institucional del ejecutivo y no a testificar acerca de asuntos sobre los cuales dichos funcionarios tengan conocimiento personal. Según el criterio del foro de primera instancia, la doctrina de separación de poderes requiere que sean los jefes de agencia quienes determinen quién habrá de comparecer ante la Asamblea Legislativa. Razonó el Tribunal que exponer la posición institucional de la agencia es a fin de cuentas un acto comprendido dentro de la gestión de hacer cumplir la ley y la política pública gubernamental, poder reservado exclusivamente a la Rama Ejecutiva. El foro de primera instancia determinó que el acto de exponer la posición institucional, por su naturaleza, no requiere la participación personal del jefe del organismo y por ende puede ser delegado en subalternos. De acuerdo al Tribunal

de Primera Instancia, las respectivas agencias comparecieron a través de sus representantes ante la Asamblea Legislativa en la Vista ejecutiva del 5 de octubre del 2005, por lo que el remedio del artículo 34-A del Código Político (la citación bajo apercibimiento de desacato) no procedía.

En cuanto a la controversia sobre la información requerida, el foro primario resolvió que según la Ley núm. 177 la información solicitada era confidencial, dado el imperativo interés público en la protección del derecho a la intimidad de los menores. El Tribunal concluyó que la Ley núm. 177 no establece una excepción a la confidencialidad de la información a favor de la Asamblea Legislativa, por lo que al legislar, y "por consideraciones de la más alta estima pública, la propia Rama auto limitó su poder investigativo". Resolvió el Tribunal que la Asamblea Legislativa debía seguir el procedimiento dispuesto para las investigaciones *bona fide* en el artículo 27 de la Ley núm. 177. Para el Tribunal de Primera Instancia, de acuerdo a la Regla 31 de las de Evidencia, al artículo 13 de la Ley núm. 205 y a lo resuelto por este Tribunal en Santiago v. Bobb y El Mundo, Inc., 117 D.P.R. 153 (1986), no se puede obligar a un funcionario a divulgar información si una ley la clasifica como confidencial, si está protegida por algún privilegio evidenciario o si revelar dicha información tiene la posibilidad de lesionar derechos fundamentales de terceros. Por último, el Tribunal

de Primera Instancia reconoció la concurrencia de los procedimientos legislativos con varios procedimientos judiciales en los cuales estaban vigentes "ordenes de mordaza". Además de los casos civiles *subjudice* antes indicados,[2] señaló el foro de primera instancia que se perfilaban casos criminales contra William Elías y Bernadette Virkler.[3] Al entender que no hubo incomparecencia, el Tribunal procedió a declarar No Ha Lugar la Solicitud de Citación presentada por la Cámara de Representantes.

Los recurridos instaron su recurso de Apelación ante el Tribunal de Apelaciones. Fundamentaron su reclamo en los amplios poderes investigativos que la Constitución le confirió a la Rama Legislativa. Además argumentaron que la sentencia del Tribunal de Primera Instancia confundía una orden de comparecencia personal indelegable a un funcionario del Ejecutivo con la responsabilidad de dicho funcionario ante el incumplimiento de un *subpœna* dirigido a la entidad gubernamental por la cual es responsable. Los recurridos explicaron que la Comisión recibió a los subalternos de las agencias objeto del *subpœna*, pero dichos

---

[2] Los casos civiles número NRSF2005-0372 y NRSF-2005-0355 están pendientes ante el Tribunal de Primera Instancia.

[3] Los casos criminales número NSCR2006-00215 y NSCR2006-00216 sobre maltrato a menores estaban pendiente a juicio, mientras que los casos NIVP2006-00346 y NIVP2006-00347, estaban pendientes de Vista Preliminar. El caso NIVP2006-00347 fue archivado.
Al presente, los casos NSCR2006-00215, NSCR2006-00216 y NIVP2006-00346 (reclasificado como NSCR2006-1050) se

funcionarios tampoco entregaron la información requerida, por lo que entendían que procedía el remedio solicitado al amparo del artículo 34-A del Código Político, *supra*.

El Tribunal de Apelaciones revocó la sentencia del Tribunal de Primera Instancia y dejó en pleno efecto la citación denegada por dicho foro. El tribunal apelativo basó su dictamen en la jurisprudencia puertorriqueña aplicable, particularmente Romero Barceló v. Hernández Agosto, 115 D.P.R. 368 (1984), en tanto establece el amplio poder legislativo de investigación y su importante deber de fiscalización al ejecutivo, facultades que se derivan de poderes expresamente otorgados a la Asamblea Legislativa por la Constitución del Estado Libre Asociado de Puerto Rico. Según el tribunal apelativo, la citación emitida por la Asamblea Legislativa a los Secretarios de Justicia y Familia forma parte esencial del trabajo constitucionalmente delegado a las comisiones legislativas.

Sobre la información pedida por la Comisión, el foro apelativo utilizó el análisis constitucional aplicable a controversias sobre el acceso a la información como parte del derecho a la libertad de expresión en una democracia. El foro intermedio concluyó que las investigaciones legislativas están incluidas en el inciso (e) del artículo 27 de la Ley núm. 177, que dispone que entre las personas, oficiales, funcionarios o agencias que tendrán acceso a los expedientes producidos en la ejecución de la dicha ley se

encuentran pendientes ante el Tribunal de Primera

encuentra cualquier persona que realice una investigación *bona fide* de datos.

El Tribunal de Apelaciones también determinó que la orden de mordaza emitida por el Tribunal de Primera Instancia en los casos pendientes iba dirigida sólo a los procedimientos judiciales, no a los legislativos. Además señaló que los autos no revelan que la familia Elías Amigo haya reclamado algún privilegio de confidencialidad. Concluyó que no habiendo algún reclamo válido de confidencialidad, procedía la entrega de la información requerida, aunque señaló que "nada impide que la Asamblea Legislativa, ante un tema tan sensitivo, imponga las medidas cautelares que entienda prudentes bajo su reglamento y la Ley núm. 177 en beneficio de las partes concernidas, durante el proceso legislativo."

En el recurso de Certiorari presentado ante este Tribunal, los peticionarios alegan que la Ley núm. 177 le aplica a la Asamblea Legislativa y limita su acceso a los expedientes solicitados. Arguyen que la Comisión debe seguir el procedimiento establecido en el artículo 27(e) que remite cualquier solicitud de datos, en el curso de una investigación *bona fide*, a la anuencia del Secretario de Familia. Según su análisis, la Asamblea Legislativa limitó su poder investigativo y el ejecutivo endosó dicha limitación mediante el proceso político de hacer y aprobar leyes. En cuanto a la violación a la doctrina de separación

Instancia.

de poderes, alegan los peticionarios que la sentencia del Tribunal de Apelaciones menoscaba el poder del ejecutivo para escoger quién habrá de comparecer a una comisión legislativa para exponer la posición institucional de la agencia investigada. Por otro lado, los peticionarios aducen que las consecuencias constitucionales de reconocer unos poderes irrestrictos a la Rama Legislativa serían nefastas. En ese sentido, argumentan que los poderes irrestrictos de investigación implican la posibilidad de su ejercicio arbitrario, con lo cual se podrían violar los derechos fundamentales de los menores involucrados al someter a escrutinio público la información incluida en sus expedientes.

Al acoger el recurso de Certiorari, le concedimos a los recurridos un término para comparecer. Con el beneficio de sus escritos resolvemos que la citación enviada al Departamento de Justicia no procede por falta de jurisdicción, ya que la Resolución núm. 2756 no delegó dicha encomienda a la Comisión. En cuanto a la citación cursada al Departamento de la Familia, resolvemos que esta adolece de vicios en su notificación que impiden su ejecución; por lo cual este Tribunal no puede hacer cumplir los *subpœnas* emitidos por la Comisión de bienestar social de la Cámara de Representantes al Departamento de Justicia y al Departamento de la Familia. Por tal razón, revocamos la sentencia del Tribunal de Apelaciones.

Lo pronunció y manda el Tribunal y lo certifica la Secretaria del Tribunal. La Jueza Asociada señora Fiol Matta emite opinión de conformidad a la cual se une el Juez Asociado señor Rebollo López; el Juez Asociado señor Rivera Pérez concurre con opinión escrita; el Juez Presidente señor Hernández Denton disiente con opinión escrita; la Jueza Asociada señora Rodríguez Rodríguez disiente sin opinión escrita.

                              Aida Ileana Oquendo Graulau
                              Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Hon. José Aponte Hernández, Presidente de la Cámara de Representantes de Puerto Rico; y Hon. Rolando Crespo Arroyo, Presidente de la Comisión de Bienestar Social de la Cámara de Representantes<br>              Recurridos<br><br><br>              v.<br><br><br>Hon. Roberto Sánchez Ramos, Secretario de Justicia; Sra. Marta Elsa Fernández, Secretaria Interina del Departamento de la Familia; Hon. Yolanda Zayas Santana, Ex secretaria del Departamento de la Familia<br>              Peticionarios | CC-2006-828 | *Certiorari* |

Opinión de Conformidad emitida por la Jueza Asociada SEÑORA FIOL MATTA a la cual se une el Juez Asociado SEÑOR REBOLLO LÓPEZ

En San Juan, Puerto Rico a 31 de marzo de 2008.

A pesar de que estoy conforme con el resultado que acordó la Mayoría de este Tribunal, entiendo que no debemos pasar por alto la oportunidad que nos brinda el recurso que hoy examinamos para delinear el alcance de la facultad de la Rama Legislativa para requerir a la Rama Ejecutiva información cuya confidencialidad está dispuesta por una ley y para aclarar la trayectoria jurisprudencial que se ha ido forjando en este tema. Me parece particularmente importante determinar el análisis jurídico que aplica a una controversia como la de autos luego de lo resuelto en <u>Peña</u>

Clos v. Cartagena Ortiz, 114 D.P.R. 576, 591 (1983). Este caso también presenta una oportunidad para esbozar algunos de los requisitos con los cuales debe cumplir todo requerimiento de información efectuado por el Estado, particularmente cuando se afectan derechos ciudadanos fundamentales.

I

Es harto conocido que la función de ser intérprete final de la Constitución le corresponde exclusivamente al Poder Judicial. En nuestra jurisprudencia hemos reiterado que aún cuando la Constitución atribuye ciertas potestades al Poder Legislativo y al Ejecutivo, la definición de sus contornos y la determinación de la validez de su ejecución representan de por sí un delicado ejercicio de interpretación constitucional reservado por nuestra tradición jurídica a los tribunales. Santa Aponte v. Hernández, 105 D.P.R. 750, 759-760 (1977); Noriega Rodríguez v. Jarabo, 136 D.P.R. 497, 516 (1994). Esto significa que ni los cuerpos y órganos legislativos ni los funcionarios ejecutivos pueden convertirse en árbitros de sus propios poderes. No le corresponde al Ejecutivo ni a la Asamblea Legislativa determinar en este caso qué información es divulgable o no, pues los tribunales son los intérpretes finales de las leyes y de la Constitución. Peña Clos v. Cartagena Ortiz, 114 D.P.R. 576, 591 (1983); Rullán v. Fas Alzamora, 2006 T.S.P.R. 5. Hemos explicado que: "Tal principio no prejuzga la amplitud o estrechez de

determinada facultad legislativa o ejecutiva y el grado de escrutinio judicial a que debe sujetársele." Romero Barceló v. Hernández Agosto, *supra* pág. 338. Más bien, la determinación de la amplitud o estrechez de cierta facultad gubernamental, y el análisis constitucional que proceda queda sujeto a un ponderado análisis de las controversias planteadas caso por caso. Como antesala a nuestra adjudicación, procedemos a exponer el origen, la naturaleza y los fines del poder investigativo de la Asamblea Legislativa.

De acuerdo al Preámbulo de nuestra Constitución, un sistema democrático es "aquel donde la voluntad del pueblo es la fuente del poder público, donde el orden está subordinado a los derechos del hombre y donde se asegura la libre participación del ciudadano en las decisiones colectivas". Más allá de consideraciones filosóficas, el funcionamiento de un sistema que lleve el calificativo "democrático" debe poseer una transparencia tal, en cuanto a su engranaje y ejecutoria, que permita el libre flujo de la información necesaria para la integración del ciudadano con la cosa pública.

Los parlamentos democráticos tienen el deber de llevar a cabo su encomienda legislativa de la manera más cónsona con la realidad social. Dentro de un sistema tripartita en el que la Asamblea Legislativa lleva el peso de la representación ciudadana, la relación entre los acontecimientos sociales y la ley requiere un cómodo

espacio de existencia dialógica. Por tal razón es imperativa la defensa de amplias capacidades investigativas que permitan la más estrecha relación entre la realidad legislada y la vivida.

Como explicamos en Peña Clos v. Cartagena Ortiz, *supra*, los orígenes del poder de un cuerpo legislador y sus órganos para efectuar investigaciones se remontan al Parlamento inglés del siglo XVI.[4] El poder de investigación que poseen los parlamentos democráticos ha sido reconocido por el Tribunal Supremo de Estados Unidos como un elemento necesario para ejecutar el poder de hacer leyes. La jurisprudencia del Tribunal Supremo federal ha resaltado consistentemente los beneficios de un cuerpo legislativo que posea la libertad necesaria para el mejor desempeño de su encargo constitucional.[5]

---

[4] Véase además James Landis, Constitutional Limitations on the Congressional Power of Investigation, 40 Harv. L. Rev. 151, 159 (1926).

[5] Las facultades de indagación legislativa se han concebido como una herramienta indispensable para alcanzar una legislación juiciosa que demuestre un sólido y cabal entendimiento del contexto en el que se genera. McGrain v. Daugherty, 273 U.S. 135 (1927). Las investigaciones del Poder Legislativo son consideradas como elemento tradicional de los gobiernos representativos. Tenney v. Brandhove, 341 U.S. 367 (1951). El Tribunal Supremo estadounidense ha descrito este poder como uno inherente a los procedimientos legislativos, y correlativo al poder de legislar. Watkins v. U.S., 354 U.S. 178 (1957); Quinn v. U.S., 349 U.S. 155 (1955). Se ha dicho que no puede haber dudas acerca del poder de la Asamblea Legislativa a realizar, como cuerpo, o a través de alguno de sus comités, investigaciones sobre asuntos relacionados a legislación vislumbrada. Quinn v. U.S., *supra*. Más aun, ha quedado establecido que este poder de inquirir se ha usado a través de la historia en función de toda una gama de intereses

La Rama Legislativa requiere la potestad de indagar, no sólo con el fin de aprobar legislación, sino para cumplir la función que le corresponde en el sistema de pesos y contrapesos que mantiene el balance del poder en un sistema de gobierno republicano como el nuestro, basado en la separación tripartita de poderes.[6] La potestad de la Asamblea Legislativa para fiscalizar al Gobierno es amplia e incluye la capacidad de buscar cualquier defecto en los sistemas sociales, económicos y políticos imperantes, de manera que puedan remediarse mediante legislación o por su mera divulgación. Este poder comprende el de indagar en

---

nacionales sobre los cuales la Asamblea Legislativa decide, de acuerdo a los resultados de la investigación misma, si procede o no legislar. Barenblatt v. U.S., 360 U.S. 109 (1959).

[6] La importancia de la facultad de inspección de las actividades del Ejecutivo fue excelentemente resumida por el Tribunal Supremo de Estados Unidos en el caso Tenney v. Brandhove, *supra*:

> It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees. It is meant to be the eyes and the voice, and to embody the wisdom and will of its constituents. Unless Congress have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served; and unless Congress both scrutinize these things and sift them by every form of discussion, the country must remain in embarrassing crippling ignorance of the very affairs which it is most important that it should understand and direct. The informing function of Congress should be preferred to its legislative function. *Id*, n.6.

Véase además Louis Fisher, Constitutional Conflicts Between Congress and the President, 4ta Ed., Kansas, U Press of Kansas.

los distintos departamentos del gobierno para exponer alguna ineficiencia, el posible desperdicio de recursos e inclusive actos de corrupción. Watkins v. U.S., *supra*.[7]

En Puerto Rico, hemos sido enfáticos en resolver que negarle a la Asamblea Legislativa poderes para compenetrarse de los hechos, "equivale al absurdo de exigirle que proporcione remedios necesarios en la oscuridad". Banco Popular, Liquidador, v. Corte, 63 D.P.R. 66, 79-80 (1944); In Re: Presidente del Senado, 148 D.P.R. 737, 761-762 (1999).[8] A partir de la Constitución del ELA, el poder parlamentario de investigación siguió considerándose, por tanto, como un poder inherente al poder Legislativo. H.M.C.A. (P.R.), Inc. et als v. Colón Carlo, 133 D.P.R. 945, nota al calce núm. 12 (1993); Rullán v. Alzamora *et als*, *supra*.

Las secciones 1 y 17 del Artículo III de nuestro texto constitucional[9] "representan la fuentes nominales, pero en el fondo persiste el concepto de que la facultad de

---

[7] Véase además Landis*, supra*, pág. 194, 197.

[8] *Id.* pág. 209.

[9] Las referidas secciones del Artículo III leen así:

> Sección 1. El poder Legislativo se ejercerá por una Asamblea Legislativa, que se compondrá de dos cámaras- el Senado y la Cámara de Representantes- cuyos miembros serán elegidos por votación directa en cada elección general.
> Sección 17. Ningún proyecto de ley se convertirá en ley, a menos que se imprima, se lea, se remita a comisión y esta lo devuelva con un informa escrito; pero la cámara correspondiente podrá descargar a la comisión del estudio e informe de

investigar es parte inseparable de la de legislar". Peña Clos v. Cartagena Ortiz, *supra*, pág. 590; In Re: Presidente del Senado, *supra*, págs. 761-762 (1999). La facultad y el deber de la Asamblea Legislativa de fiscalizar la ejecución de la política pública y la conducta de los jefes de departamento mediante el ejercicio de sus poderes de investigación fueron reconocidos por este Tribunal, en Romero Barceló v. Hernández Agosto, *supra*. pág. 374. Allí establecimos que los poderes de formular leyes, fiscalizar al gobierno, debatir asuntos de interés general e informar al país sobre la marcha de la cosa pública provienen del propio concepto de un gobierno dividido en tres poderes coordinados, independientes y de idéntico rango. Concluimos además que dichas potestades no están subordinadas a la de legislación, pues contienen en sí su propia justificación, en cuanto contribuyen al desempeño del papel constitucional de una asamblea representativa. A fin de cuentas, la Asamblea Legislativa es la institución forjadora de las leyes y la política pública que rige el destino del Pueblo. Noriega Rodríguez v. Jarabo, 136 D.P.R. 497 (1994).

La facultad investigativa y fiscalizadora de la Asamblea Legislativa se ejerce, de ordinario, a través de sus comisiones, a las que la Convención Constituyente calificó como el "corazón del cuerpo legislativo". Silva v.

---

cualquier proyecto y proceder a la consideración del mismo.

<u>Hernández Agosto</u>, 118 D.P.R. 45, 66 (1986). A pesar de que nuestra Constitución no define lo que constituye una comisión legislativa, este Tribunal ha entendido que la sección 9 del Artículo III, donde se establece que "[c]ada cámara adoptará las reglas propias de cuerpos legislativos para sus procedimientos y gobierno interno", faculta al Poder Legislativo a crear comisiones y delimitar su jurisdicción y facultades. *Id*. También hemos expresado que la sección 17 del Artículo III de nuestro texto constitucional elevó a rango constitucional la existencia de las comisiones legislativas al disponer que:

> Ningún proyecto de ley se convertirá en ley, a menos que se imprima, se lea, se remita a comisión y ésta lo devuelva con un informe escrito… la cámara correspondiente podrá descargar a la comisión del estudio e informe de cualquier proyecto y proceder a la consideración del mismo.[10]

En <u>Silva v. Hernández Agosto</u>, *supra*, reconocimos que las comisiones han facilitado y hecho más eficaces las labores fiscalizadoras de la Rama Legislativa, han agilizado el flujo de ideas provenientes de la comunidad, y han promovido el proceso de negociación interna.

En aras de promover y viabilizar el poder investigativo, el Código Político de 1902, según enmendado, incorporó estatutariamente la referida facultad investigativa de la Asamblea Legislativa en su artículo 31, 2 L.P.R.A. sec. 151, cuyas palabras leen como sigue:

(a) Toda citación requiriendo a un testigo para que comparezca ante la Asamblea Legislativa, la Cámara de Representantes, el Senado, o una comisión o subcomisión de cualquiera de dichos cuerpos, o una comisión o subcomisión conjunta de ambos cuerpos, con el propósito de declarar, o de producir o entregar documentos u objetos, o para ambas cosas, podrá ser expedida por el Presidente del Senado, el de la Cámara o el de la comisión o subcomisión ante la cual se desea que comparezca el testigo y al efecto bastará que:

(1) Se precise en ella si el acto ha de tener lugar ante la Asamblea Legislativa, la Cámara de Representantes, el Senado, una comisión o subcomisión conjunta de ambos cuerpos, una comisión o subcomisión de la Cámara o del Senado.

(2) Vaya dirigida al testigo.

(3) Se requiera que dicho testigo comparezca en el día, hora y lugar determinados y, en caso necesario, se requieran los documentos u objetos interesados.

(4) Lleve la firma del Presidente del Senado, de la Cámara de Representantes o del Presidente de una comisión o subcomisión.

(b) El Presidente de cualquier comisión o subcomisión del Senado o de la Cámara de Representantes o de una comisión o subcomisión conjunta de ambos cuerpos, podrá expedir una citación requiriendo a un testigo para que comparezca ante un oficial investigador a declarar o a producir o entregar documentos u objetos o para ambas cosas, siempre y cuando se cumpla con los siguientes requisitos:

(1) Que la investigación que se está llevando a cabo y dentro de la cual se hace la citación, haya sido ordenada mediante resolución del cuerpo o mediante resolución concurrente de ambos cuerpos y que la resolución especifique que la Comisión podrá emitir citaciones para que un testigo comparezca a declarar o a presentar documentos u objetos, o ambas cosas, ante un oficial investigador.

(2) La citación cumple con todos los requisitos mencionados en esta sección. 2 L.P.R.A. sec. 151.

---

[10] Véanse además 2 Diario de Sesiones de la Convención Constituyente 854 y 4 Diario de Sesiones de la Convención Constituyente 2584.

Por su parte, en cuanto a las órdenes de citación que puede emitir la Comisión, la sección 5.20 del Reglamento de la Comisión de Bienestar Social establece que:

> El Presidente de la Comisión tendrá facultad de expedir órdenes de citación a cualquier persona para que comparezca a contestar preguntas o a suministrar la información que la Comisión puede requerir al estudiar cualquier asunto o medida que le haya sido sometida. Dichas citaciones serán firmadas por el Presidente y podrán ser dirigidas al (la) Sargento de Armas para su diligenciamiento.

Como explicamos en Banco Popular, Liquidador v. Corte, *supra*, el desarrollo de las doctrinas jurisprudenciales sobre el poder investigativo de la Asamblea Legislativa está íntimamente ligado a las controversias sobre su poder de castigar por desacato. En Estados Unidos el poder de la Rama Legislativa de condenar por desacato civil, como mecanismo para asegurarse de recibir cierta información necesaria, ha sido tratado como atributo esencial de los poderes conferidos constitucionalmente a dicha Rama. McGrain v. Daugherty, 273 U.S. 135 (1927). Se ha entendido que sin el poder de investigación, acompañado del poder de compeler a los testigos a emitir testimonio, la Rama Legislativa se podría ver seriamente truncada en el ejercicio sabio y efectivo de sus funciones constitucionales. Quinn v. U.S., *supra*.[11]

En nuestra jurisdicción, somos concientes de que el ejercicio de esos poderes "depende grandemente de la

---

[11] Véase además Landis, *supra*, pág. 199.

facultad que tienen los cuerpos y comisiones legislativas de citar testigos a comparecer y a traer los documentos pertinentes a las vistas convocadas al amparo de una delegación autorizada por el cuerpo correspondiente." Hernández Agosto v. Betancourt, 118 D.P.R. 79, 83-84 (1986). Por esa razón, repetidamente hemos convalidado los poderes investigativos de las comisiones y su facultad de citar testigos *so pena* de desacato. Peña Clos v. Cartagena Ortiz*, supra*; Hernández Agosto v. Betancourt, *supra*; Pueblo v. Pérez Casillas, 117 D.P.R. 380 (1986); Silva v. Hernández Agosto, *supra.*

El Código Político, según enmendado, provee en sus artículos 34 y 34-A dos procedimientos que tienen disponibles cualquiera de las Cámaras Legislativas para recurrir a los tribunales a vindicar su autoridad y ordenar la comparecencia de un testigo que se ha negado a declarar o a producir los documentos requeridos. 2 L.P.R.A. secs. 154 y 154 (a). Mediante el artículo 34, luego de que los testigos hayan incumplido con las citaciones, el Presidente o Vicepresidente de la Cámara correspondiente tiene que someter al Secretario de Justicia una certificación con una relación de hechos que explique lo sucedido. Le corresponde al Secretario de Justicia formular acusaciones criminales contra dichas personas por negarse a asistir, testificar o presentar evidencia. Pueblo v. Pérez Casillas, *supra*; Rullán v. Fas Alzamora, *supra.*

Por otro lado, el artículo 34-A, *supra*, permite que ambos cuerpos acudan directamente a los tribunales para

requerir la asistencia y la declaración de testigos y la producción y entrega de los documentos solicitados. Una vez se radica la petición, el Tribunal expide una citación requiriendo y ordenando la comparecencia de los testigos con los documentos solicitados.  Si se desobedece la orden, el tribunal considerará el asunto como un desacato civil. Antes de declarar incurso en desacato a un testigo que se ha negado a comparecer a la Asamblea Legislativa, el tribunal tiene que ofrecerle una oportunidad adecuada para defenderse. A dichos efectos se celebrará una vista en la que el testigo podrá presentar todas las cuestiones constitucionales, legales y de hecho que estimare pertinentes. Hernández Agosto v. Betancourt, *supra*; In Re: Presidente del Senado, *supra*.

II

En esta ocasión, la Cámara de Representantes ha recurrido al artículo 34-A para solicitar a los tribunales que se ordene el cumplimiento con los *subpœnas duces tecum* cursados por su Comisión de Bienestar Social a los Departamentos de Justicia y Familia. Al examinar su solicitud, no podemos obviar que **no obstante la amplitud que se ha reconocido al poder inquisitivo de la Asamblea Legislativa, dicho poder está sujeto a los límites que este Tribunal vaya señalando al interpretar la Constitución.** No podemos abdicar nuestro rol como árbitro final de la Constitución y guardián constitucional de los derechos de los ciudadanos. De esa encomienda partimos, no sin antes

reconocer que nuestra gestión en tan delicada tarea tampoco es absoluta, pues está regida por estrictas consideraciones jurídicas.[12]

En In Re: Presidente del Senado, *supra*, indicamos que el tema de las investigaciones legislativas es, para el Poder Judicial, un área "sensitiva". Jurisprudencialmente se observa una tendencia a proceder cautelosamente en este tipo de caso. En varias decisiones se aconseja vigorosamente la abstención judicial hasta tanto la intervención sea ineludible; antes, nuestro deber es abstenernos de definir los límites de los poderes legislativos.[13] Se ha establecido que aun cuando no existe una prohibición absoluta a la revisión judicial de los procedimientos legislativos, ello no significa que los tribunales tengan la obligación de intervenir cada vez que se les presenta alguna controversia relacionada a estos procesos. En otras palabras, hay que distinguir entre la existencia del poder para intervenir y cuándo es prudente ejercerlo. El ejercicio de nuestra facultad interpretativa en materia de poderes legislativos es imperativa cuando las

---

[12] Históricamente y en momentos de apasionamiento político, se han hecho acusaciones e insinuaciones sobre las motivaciones que conducen a las comisiones legislativas en sus procesos investigativos. Reiteradamente, tanto este Tribunal, como el Tribunal Supremo estadounidense han expresado que los tribunales no son el foro para ventilar tales controversias, ello le corresponde a los procesos políticos y electorales. Peña Clos v. Cartagena, *supra;* Romero Barceló v. Hernández Agosto, *supra*.

[13] U.S. v. Rumely, 345 U.S. 41 (1953).

actuaciones de otras ramas presenten claros problemas respecto a su constitucionalidad. Acevedo Vilá v. Melendez Ortiz, 2005 T.S.P.R. 79.

Nuestra incursión en este tema debe tener como premisa que el alcance del poder de investigación de la Rama legislativa es tan amplio y penetrante como su potencial para promulgar leyes.[14] Es decir, dicho poder goza de la misma presunción de razonabilidad de todo acto legislativo, pero sus límites son aquellos dispuestos en la Constitución a toda acción estatal, bien por la doctrina de separación de poderes[15] o por los confines que impone la Carta de Derechos.[16] Acevedo Vilá v. Meléndez Ortiz, *supra*. Por ello la autoridad investigativa de la Asamblea Legislativa no debe estar sujeta a la intervención de los tribunales a menos que se ejerza de manera arbitraria, infringiendo una de estas dos limitaciones constitucionales que se le imponen a todas las ramas del gobierno. Peña Clos v. Cartagena Ortiz, *supra*; Rullán v. Fas Alzamora *et als*, 2006 T.S.P.R. 5.[17]

A los fines de determinar si un cuerpo legislativo se ha extralimitado en el ejercicio de su poder de investigación, adoptamos en Peña Clos v. Cartagena Ortiz,

---

[14] Barenblatt v. U.S., 360 U.S. 109 (1959).

[15] Kilbourn v. Thompson , 103 U.S. 168 (1880); Tenney v. Brandhove, 341 U.S. 367 (1951) ; Barenblatt v. U.S., 360 U.S. 109 (1959).

[16] McGrain v. Daugherty, 273 U.S. 135 (1927); Tenney v. Brandhove, *supra*.

*supra*, la distinción que ha elaborado la jurisprudencia estadounidense entre las investigaciones legislativas dirigidas a individuos y las investigaciones legislativas de funcionarios o departamentos gubernamentales, según la cual, cuando el choque surge entre las ramas legislativa y ejecutiva, y no entre aquella y ciudadanos particulares, la rama judicial debe actuar con especial mesura.[18] El criterio tradicionalmente empleado por los tribunales en esos casos es el de la razonabilidad. Este análisis requiere inquirir sobre varios extremos particulares para determinar si se ha usado ese poder de manera arbitraria; estos son: si la comisión o cámara legislativa tiene jurisdicción para ejercer dicho poder; si persigue un propósito de naturaleza legislativa y si la utilización de ese poder conlleva la invasión de alguna prerrogativa consagrada en la carta de derechos.

Sin embargo en Peña Clos v. Cartagena Ortiz, *supra*, ante una alegación de confidencialidad, no nos ceñimos al método tradicional que hemos expuesto anteriormente, sino que utilizamos también el método de sopesar intereses, para

---

[17] Véase tambien Barenblatt v. U.S., *supra*.

[18] La razón es que las investigaciones legislativas dirigidas a oficiales ejecutivos o agencias públicas envuelven consideraciones distintas de las que imperan en las investigaciones dirigidas a ciudadanos particulares. Véanse McGrain v. Daugherty, *supra*, (investigación al Secretario de Justicia); Tenney v. Branhove, *supra,* (investigación a un individuo); Raoul Berger, Congressional Subpoenas to Executive Officials, 75 Columbia Law Review 865, 869-870 (1975).

determinar la validez de unos *subpœnas* legislativos.[19]  En aquella ocasión, ambos análisis nos llevaron a la misma conclusión jurídica, pero nunca aclaramos cuándo debe utilizarse uno u otro método.[20]  Las circunstancias del presente caso nos presentan la oportunidad de precisar el método de análisis constitucional que debemos aplicar cuando la Rama Legislativa solicita información custodiada por la Rama Ejecutiva que es confidencial por disposición de ley.

Como expresamos en Peña Clos v. Cartagena Ortiz, *supra*, pág. 598, dentro de nuestro sistema constitucional, la Rama Ejecutiva no es

> …el único guardián de la confidencialidad de los secretos del Estado.  De ahí que para evitar la invocación espuria del privilegio, se acostumbre legislar para especificar su extensión, sujeto a la determinación final de los tribunales.

Este tipo de legislación, que indica las condiciones en que determinada información en poder del Estado es confidencial, es de vital importancia ya que ayuda a evitar que se sustraiga del escrutinio publico información a la que tiene derecho la ciudadanía en un sistema democrático. Ya hemos expresado que "[h]oy día se reconoce que el medio más efectivo de salvaguardar información sensitiva recopilada por el Estado en su gestión oficial, cuya

---

[19] Ello a pesar de que expresamos que no habíamos hallado decisión alguna en la que se empleara el método de sopesar intereses en una controversia de este tipo.
[20] Véase Aníbal Acevedo Vilá, Asamblea Legislativa y su Poder Investigativo, 56 Rev. Col. Abo. P.R. 61 (1995).

divulgación pudiera lesionar el interés público, es mediante legislación especial." Santiago v. Bobb y El Mundo, Inc., 117 D.P.R. 153 (1986) citando a E. Rivera Ramos, La libertad de información: necesidad de su reglamentación en Puerto Rico, 44 Rev. Jur. U.P.R. 67 (1975).

En Angueira v. Junta de Libertad Bajo Palabra, 150 D.P.R. 10, 24-25 (2000) una ley establecía la confidencialidad de la información gubernamental que la ciudadana reclamaba. Allí reiteramos la norma general que configuramos en Santiago v. Bobb y El Mundo, *supra*, pág. 159, a los efectos de que los reclamos de confidencialidad por parte del Estado sólo pueden prosperar si éste prueba de forma precisa e inequívoca cualquiera de las siguientes: (1) que una ley declara dicha confidencialidad; (2) que la comunicación está protegida por alguno de los privilegios evidenciarios que pueden invocar los ciudadanos; (3) que revelar la información puede lesionar derechos fundamentales de terceros; (4) que se trata de la identidad de un confidente, o (5) que es información oficial conforme la Regla 31 de Evidencia, *supra*. De acuerdo a la doctrina constitucional imperante, en ese caso establecimos que en nuestro ordenamiento, el análisis judicial requerido ante un reclamo de confidencialidad dependerá de cuál de estas excepciones a la divulgación invoque el Gobierno. Al confrontar el derecho fundamental de la reclamante al acceso a la

información, que es reconocido corolario del derecho a la libertad de expresión, con la ley en controversia, reafirmamos lo que años antes habíamos resuelto en Soto v. Secretario de Justicia, 112 D.P.R. 477 (1982), y procedimos a analizar dicha ley bajo un escrutinio estricto.

Más recientemente, en Colón Cabrera *et als* v. Caribbean Petroleum Corporation, 2007 T.S.P.R. 48, resolvimos otra controversia entre el reclamo de acceso a la información gubernamental por parte de unos individuos y una ley que establecía la confidencialidad de la información requerida. En esa ocasión quedó resuelto que al adoptar una ley de tal naturaleza, el legislador realiza un balance previo entre los intereses en conflicto: por un lado, el acceso a información **por un ciudadano** y, por el otro, el interés del Estado en que determinada información permanezca fuera del escrutinio público.[21]

Ahora bien, si una ley clasifica como confidencial cierta información del Ejecutivo y el reclamo de acceso a ésta se basa en un derecho constitucionalmente reconocido a la ciudadanía, como lo es el derecho a la libertad de expresión, el balance de intereses que el poder legislativo

---

[21] En dicho caso concluimos que aún cuando el legislador haya establecido la estricta confidencialidad de la información obtenida por una agencia del ejecutivo, y aún cuando al aplicar las doctrinas sobre acceso a la información y efectuar el análisis del balance de intereses a favor de la divulgación prevaleciera un interés apremiante del Estado en la confidencialidad, el público tiene acceso a la información elaborada a partir de la información obtenida, si bien ésta permanece confidencial.

llevó a cabo al legislar queda sujeto al balance de intereses que tiene que efectuar el poder judicial a favor del derecho reclamado. Cuando las garantías constitucionales que protegen a las personas del ejercicio arbitrario de los poderes estatales se ven amenazadas por cualquier actuación u omisión gubernamental, debemos escrutar la controversia de manera que favorezca el ejercicio de los derechos invocados, a menos que el Estado muestre tener un interés apremiante que justifique la limitación al derecho reclamado. En esas circunstancias se impone, pues, un escrutinio estricto. Ello de acuerdo a nuestra obligación de velar porque ninguna actuación del Estado intervenga irrazonablemente con el ejercicio de los derechos fundamentales **de las personas.**

**En cambio, no es necesario sopesar intereses para determinar si procede un reclamo de información que se haga al Ejecutivo si dicho reclamo no está fundamentado en derechos constitucionales de la ciudadanía, sino en los poderes constitucionales de una rama del gobierno frente a otra.** Según lo expresado anteriormente, nuestro deber constitucional al delimitar los poderes investigativos de la Rama Legislativa en su función fiscalizadora ante el Ejecutivo, nos obliga a proceder con deferencia y a presumir la razonabilidad y legitimidad de los actos y procedimientos legislativos. Por eso, el análisis jurídico que procede cuando la información requerida por la Rama Legislativa al Ejecutivo en su función fiscalizadora esté

vedada al escrutinio público por una ley que establezca su confidencialidad, no es el de sopesar intereses, sino el análisis que impone nuestra tradición constitucional ante las actuaciones de la Rama Legislativa, el llamado análisis tradicional.[22]

### III

En el caso de autos debemos determinar si la Asamblea Legislativa ha usado su poder investigativo de manera arbitraria o si el ejercicio de este poder es constitucionalmente válido según los dos límites que típicamente impone la Constitución a las ramas de gobierno en un Estado de Derecho, la doctrina de separación de poderes y la Carta de Derechos. En fin, nos corresponde analizar si la Comisión tiene jurisdicción para ejercer el poder que reclama; si su investigación persigue un propósito legislativo legítimo y si la utilización de ese poder conlleva la invasión de alguna prerrogativa consagrada en la Carta de Derechos.

### A.

La Cámara de Representantes no puede exceder sus poderes investigativos y usurpar poderes de otras ramas del gobierno. A tono con ese requisito, el poder legislativo de investigación tiene que limitarse a los asuntos para los cuales tiene jurisdicción. Como cuestión de umbral, para

---

[22] Paul C. Rosenthal y Robert S. Grossman, Congressional Access to Confidential Information Collected by Federal Agencies, 15 Harvard Journal on Legislation 74, 100-118 (1977).

que las comisiones legislativas operen dentro de nuestro esquema constitucional, deben estar legalmente constituidas. Cumplido este mandato, las comisiones sólo pueden dedicarse a investigar aquello que se les asigne mediante una resolución debidamente aprobada. Hernández Agosto v. Betancourt, *supra*.[23]

Las resoluciones legislativas que autorizan investigaciones deben tener un fin legítimo, es decir, deben perseguir un fin que caiga dentro de los poderes constitucionales de la Rama Legislativa. De ser así, los tribunales están obligados a presumir la legitimidad del propósito de la actuación legislativa. Banco Popular, Liquidador v. Corte, *supra*.[24] Además de poseer una finalidad legítima, las resoluciones que autorizan las investigaciones legislativas deben ser específicas, de manera que los tribunales no caigan en procesos de racionalización retrospectiva.[25]

Debe quedar claro que aunque los tribunales no deben establecer reglas rígidas según las cuales la Asamblea Legislativa deba redactar sus resoluciones, si hay derechos de individuos afectados, el tribunal debe intervenir.[26]

---

[23] En Watkins v. U.S., *supra*, el Tribunal Supremo Estadounidense calificó de "jurisdiccional concept of pertinency" a este aspecto de las instigaciones legislativas.

[24] Véase además Sinclair v. United States, 279 U.S. 263 (1929).

[25] Kilbourn v. Thompson, 103 U.S. 168 (1880); Watkins v. U.S., *supra*.

[26] Watkins v. U.S., *supra*.

Este Tribunal se verá en la necesidad de delinear los límites constitucionales al poder investigativo de la Asamblea Legislativa sólo cuando se demuestre de manera inequívoca que ésta ha autorizado una investigación de dudoso alcance.[27]

La Asamblea Legislativa, mediante su poder de reglamentación interna, promulgó el Reglamento de la Cámara de Representantes de Puerto Rico. En su Regla 11, dicho Reglamento regula todo lo pertinente al funcionamiento de las comisiones la Cámara. De acuerdo a la sección 11.1 de dicho Reglamento, los trabajos de la Cámara de Representantes se organizarán a través de Comisiones Permanentes o Especiales. En cuanto a la Jurisdicción de las Comisiones, la Sección 11.2 establece que:

> Se remitirán a las Comisiones Permanentes y Especiales los proyectos, resoluciones, mensajes, peticiones, memoriales y documentos, tomando como base la jurisdicción en particular de cada Comisión, según ésta se establezca en la Resolución de la Cámara que se adopte para la creación y determinación de jurisdicción de las Comisiones.

---

[27] En este punto nos parece pertinente ilustrar el tema con una cita de U.S. v. Rumely, 345 U.S. 41 (1953):

> Although the indispensable informing function of congress is not to be minimized, determination of the rights which this function implies illustrates the common juristic situation thus defined for the Court by Mr. Justice Holmes: "All rights tend to declare themselves absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached."

La Regla 13, sección 13.1, prescribe que las Comisiones Permanentes tendrán las siguientes funciones y facultades:

(a) redactar y presentar proyectos de ley, resoluciones y medidas legislativas sustitutivas;

(b) investigar, estudiar, evaluar, informar, hacer recomendaciones, enmendar o sustituir aquellas medidas legislativas que le hayan sido referidas o asuntos relacionados con su jurisdicción;

(c) revisar y ejercer supervisión continua sobre la implantación y administración de todas aquellas leyes que correspondan a los asuntos incluidos en su jurisdicción. Para el logro de ello, estudiará los informes y datos pertinentes sometidos por los organismos del Gobierno a la Cámara y realizará las investigaciones necesarias;

(d) celebrar audiencias públicas o vistas públicas, vistas oculares y reuniones ejecutivas, citar testigos, escuchar testimonios, inclusive bajo juramento, y solicitar toda aquella información documental o de cualquier otra naturaleza que considere necesaria para su gestión.

Por su parte, el Reglamento de la Comisión de Bienestar Social establece en su Sección 2.2 que:

Conforme a la Resolución de la Cámara Núm. 2 de 2 de enero de 2005, la Comisión de Bienestar Social tendrá jurisdicción sobre medidas legislativas dirigidas al funcionamiento y la provisión de todo tipo de servicios de bienestar social en Puerto Rico. Sin que se entienda como limitación, tendrá injerencia sobre asuntos que atañen las comunidades marginadas, personas de edad avanzada, personas con impedimentos físicos o mentales, personas sin techo, personas con problemas de adicción o con comportamientos compulsivos, menores víctimas de violencia doméstica, a fin de establecer la política pública que propicie el mejor nivel de servicios que requieran estas poblaciones, a nivel estatal, regional o local.

La Comisión velará porque las referidas poblaciones tengan, entre otros, los beneficios

de asistencia económica, rehabilitación física, económica y emocional, asistencia nutricional y provisión de alimentos, así como la provisión de servicios de centros de cuido o amas de llave, según sea el caso.

La Comisión tendrá facultad de investigar, evaluar, informar y hacer recomendaciones sobre los asuntos ante su consideración. Además evaluará y velará por el buen funcionamiento de aquellas agencias, departamentos, oficinas, juntas, corporaciones públicas, municipios y demás entidades del gobierno del Estado Libre Asociado de Puerto Rico, a los fines de determinar si las mismas cumplen efectivamente con las leyes y reglamentos aprobados en virtud de ley.

La Comisión tendrá jurisdicción sobre cualesquiera otros asuntos referidos a ésta por la Cámara de Representantes, o por el Presidente de ese cuerpo, relacionados con asuntos sobre los que tiene jurisdicción, según lo dispuesto en la Resolución de la Cámara Núm. 2, aprobada el 10 de enero de 2005

La Sección 4.1 del referido Reglamento de la Comisión dispone las funciones y facultades de la Comisión, entre estas:

a) Redactar y preparar Proyectos de Ley, Resoluciones y Medidas Legislativas sustitutivas.
b) Investigar, estudiar, evaluar, informar, hacer recomendaciones, enmendar o sustituir aquellas medidas legislativas que le hayan sido referidas o asuntos relacionados con su jurisdicción.
c) Celebrar vistas públicas y reuniones ejecutivas, citar testigos, escuchar testimonios, inclusive bajo juramento y solicitar toda aquella información documental o de cualquier otra naturaleza que considere necesaria para su gestión.
d) Ejercer supervisión continua sobre la implantación y administración de aquellas leyes que correspondan a los asuntos incluidos en su jurisdicción. Para el logro de ello, estudiará los informes y datos pertinentes sometidos por los organismos de Estado Libre Asociado a la

Cámara y realizará las investigaciones necesarias.

e) Investigar, estudiar, evaluar, informar, hacer recomendaciones, enmendar o sustituir aquellas medidas o encomiendas que le hayan sido referidas por el Presidente, así como por la Cámara de Representantes.

De la letra de ambos Reglamentos surge el poder investigativo conferido por la Asamblea Legislativa a la Cámara de Representantes, que ésta a su vez delegó en la Comisión para investigar y fiscalizar el cumplimiento de las leyes relacionadas a asuntos tales como el maltrato infantil. El evaluar el cumplimiento de las funciones delegadas al Departamento de Familia está claramente bajo su jurisdicción, al igual que el recomendar posibles acciones administrativas y legislativas en torno a los procedimientos seguidos por este Departamento del Ejecutivo. La Resolución núm. 2756 del 13 de septiembre de 2005 se adopta dentro del marco de esa delegación y encomienda la investigación que da pie al presente recurso exclusivamente en cuanto a los procedimientos seguidos por el Departamento de la Familia. El decreto promulgado por la Cámara de Representantes de Puerto Rico en dicha Resolución consta de dos secciones que leen como sigue:

Sección 1- Se ordena a la Comisión de Bienestar Social de la Cámara de Representantes de Puerto Rico realizar una investigación en torno a los procedimientos seguidos por el Departamento de la Familia en el caso del niño Matthew Elías Amigo y sus hermanos.

Sección 2- la Comisión de Bienestar Social someterá a la Cámara de Representantes un informa contentivo de sus hallazgos, conclusiones y aquellas recomendaciones que estime pertinentes, incluyendo las acciones legislativas y

administrativas que deben adoptarse con relación al asunto objeto de esta investigación, dentro de los 60 días, después de aprobarse esta Resolución.

De lo anterior se colige que la Comisión está constitucionalmente autorizada a inquirir sobre el funcionamiento del Departamento de la Familia en el caso de epígrafe. Ahora bien, la Comisión ha requerido no sólo la comparecencia de dicha instrumentalidad, sino la comparecencia del Departamento de Justicia, así como el acceso a expedientes que éste tiene bajo su custodia. La Resolución núm. 2756 no delega a la Comisión de Bienestar Social facultad alguna para fiscalizar al Departamento de Justicia, por lo que la pesquisa legislativa se debe limitar al Departamento de la Familia.

B.

Una vez resuelto que la Comisión está autorizada a escrutar las acciones del Departamento de la Familia, debemos evaluar si hay un propósito legislativo legítimo para el ejercicio de ese poder investido. En Quinn v. U.S., *supra*, el Tribunal Supremo de Estados Unidos advirtió que el poder de investigación no debe confundirse con los poderes para ejecutar las leyes de la Rama Ejecutiva o para adjudicar controversias de la Rama Judicial. Véase también Watkins v. U.S., *supra,* donde además se indicó que ninguna pesquisa implica, de por sí, un propósito legislativo y que la mera apariencia de un propósito legislativo no justifica una investigación.

En el caso ante nos, la inquisición tiene un propósito claramente legislativo, tanto en su fin último, que es el de posiblemente proponer legislación, como en su medio, que es la labor de supervisión al Ejecutivo. Ambas facultades, como hemos discutido, son propias de los parlamentos democráticos de gobiernos republicanos con estructura tripartita.

C.

Por último, al ejercer nuestra prerrogativa de entronque constitucional debemos auscultar tanto la información que la Comisión pretende obtener mediante el *subpœna* emitido al Departamento de la Familia, como sus métodos para obtenerla. Al así proceder nuestro rol es evitar lesiones a algún derecho comprendido en nuestra Carta de Derechos.

A mediados del siglo pasado, en el contexto de investigaciones legislativas a individuos que testificaban ante una de las comisiones del Congreso, la jurisprudencia estadounidense comenzó a forjar una limitación constitucional a las pesquisas que podían de alguna manera afectar las protecciones reconocidas a las personas en la Carta de Derechos. Es precisamente en el contexto de las investigaciones compulsorias que ha surgido históricamente la necesidad de proteger los derechos individuales.[28] Por ello, según reconoce la opinión en el caso de <u>Sinclair v.</u>

---

[28] <u>Watkins v. U.S.,</u> *supra*.

United States, 279 U.S. 263 (1929) desde Kilbourn, *supra*, decidido a fines del siglo XIX, se ha ido erigiendo un baluarte contra las amplísimas intromisiones legislativas en los asuntos privados de los individuos que están constitucionalmente tutelados. Dicho caso estableció que **todas** las investigaciones del Congreso de los Estados Unidos debían entenderse limitadas por la Carta de Derechos, pues los principios que encarnan la esencia de la libertad amparada por la Constitución prohíben toda invasión gubernamental en el santuario del hogar y en las intimidades de la vida individual, ya sea por una de sus Ramas o por la actuación de algún funcionario o funcionaria.

En Watkins, *supra*, el Tribunal Supremo de Estados Unidos expresó que cuando la Asamblea Legislativa ejerce su poder de investigación con propósitos fiscalizadores carece del poder para aprobar resoluciones tan amplias que le permitan indagar en áreas protegidas por el derecho a la intimidad que no estén relacionadas a la ineficiencia o corrupción gubernamental.[29]

El caso de Sinclair, *supra*, subrayó la renuencia del Tribunal Supremo de Estados Unidos a interpretar un acto del Congreso de manera tal que autorice el examen de un testigo en cuanto a sus asuntos personales. Por eso estableció que la protección provista en la Cuarta enmienda

---

[29] *Id,* pág. 200, n.30.

de la Constitución de Estados Unidos limita las investigaciones legislativas.[30]

La misma protección la confiere nuestra Carta de Derechos contenida en el Artículo II de la Constitución, cuando dispone en sus secciones 8 y 10, que el Gobierno, actuando a través de cualquiera de sus tres ramas debe garantizar, por un lado, que "toda persona tiene protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar" y por otro, que "[n]o se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables." Se ha dicho que estas secciones consustanciales protegen a nuestra ciudadanía puertorriqueña de una manera más abarcadora que la constitución federal contra actuaciones arbitrarias e irrazonables del Estado que trastoquen esferas consideradas social, cultural o tradicionalmente como íntimas. *Rullán v. Alzamora, supra. Empresas Puertorriqueñas de Desarrollo, Inc., v. Hermandad Independiente de Empleados Telefónicos*,

---

[30] Véanse también *Marshall v. Gordon, supra*; *McGrain v. Daugherty, supra*; *Tenney v. Brandhove, supra*. Se ha resuelto que la Primera y Quinta enmienda de la Constitución de Estados Unidos también aplican a las investigaciones legislativas hechas a individuos. Sobre la aplicación de la Primera enmienda véanse *Watkins v. U.S.*, supra, pág. 188. Sobre la aplicación de la Quinta enmienda véanse *Quinn v. U.S.*, 349 U.S. 155, 162 (1955); *McPhaul v. U.S.*, 364 U.S. 372 (1960); *Rogers v. U.S.*, 340 U.S. 367 (1951); *Emspak v. U.S.*, 349 U.S. 190 (1955).

150 D.P.R. 924, 948-949 (2000); H.M.C.A. (P.R.), Inc. *et als* v. Colón Carlo, *supra.*[31]

Hemos aplicado estos principios al analizar los poderes investigativos del Contralor, los cuales, según hemos establecido, son semejantes en su alcance a la amplia facultad investigativa de la asamblea legislativa. H.M.C.A. (P.R.), Inc. *et als* v. Colón Carlo, *supra*. Así, en RDT Construction Corporation v. Colón Carlo, I, 141, D.P.R. 424, 433 (1996), no obstante reconocer que los poderes investigativos delegados al Contralor son tan amplios como sean necesarios para desempeñar cumplidamente su encomienda constitucional, le conferimos una protección al investigado cuando la información requerida por el Contralor se encuentre en poder de un tercero. En la opinión germana emitida en RDT Construction Corp. v. Colón Carlo II, 141 D.P.R. 861, 863-864 (1996) aclaramos el mecanismo que establecimos en RDT Construction v. Colón Carlo I, *supra*, para asegurar que los tribunales tengan una oportunidad de evaluar la razonabilidad de un *subpœna* dirigido a un tercero y determinar su procedencia, si quien está siendo investigado decide impugnarlo. Dicho mecanismo consiste en notificar a la persona en quien se ha centrado

---

[31] Véanse además Pueblo v. Meléndez Rodríguez, 136 D.P.R. 587 (1994); Pueblo v. Muñoz, Colón y Ocasio, 131 D.P.R. 965 (1992); Rodríguez Rodríguez v. E.L.A., 130 D.P.R. 562 (1992); Pueblo v. Rivera Colón, 128 D.P.R. 672 (1991); Pueblo v. Malavé González, 120 D.P.R. 470 (1988); Pueblo v. Falú Martínez, 116 D.P.R. 828, (1986); Pueblo v. Dolce, 105 D.P.R. 422 (1976).

la investigación cuando se le requiriera a un tercero la producción de documentos sobre los cuales el investigado alberga una expectativa de intimidad.

Nuevamente aplicamos e hicimos más estricto dicho mecanismo de notificación en Rullán v. Fas Alzamora, *supra*. Ese caso guarda mucha relación con el caso de autos. En aquella ocasión, la Asamblea Legislativa aprobó una resolución para efectuar una investigación con el fin de fiscalizar a la televisora del gobierno. Dicha resolución delegaba su ejecución a una comisión legislativa especial. Como parte de la investigación, la comisión le solicitó al Departamento de Hacienda copia de las planillas e información de índole contributiva perteneciente a los demandantes en ese caso, pero custodiada por dicho Departamento. Aun cuando una ley autorizaba la divulgación de la información requerida, fuimos más que enfáticos al recalcar la expectativa de intimidad que tenían los demandantes de ese caso sobre los documentos solicitados, y por ende, el derecho que tenían a ser debidamente notificados. El requisito de notificación no pretende otra cosa que darle una oportunidad a quien posee una expectativa de intimidad sobre cierta información en manos de tercero, para que intervenga en la solicitud y levante las defensas, objeciones y argumentos constitucionales que estime pertinentes. Estos derechos limitan el amplio poder investigativo de la Asamblea Legislativa.

La Comisión de Bienestar Social, mediante el *subpœna* que nos solicita que pongamos en vigor, requirió al Departamento de la Familia la entrega de todos aquellos documentos, expedientes e información que obren en su poder, entre éstos el historial del expediente del niño Mathew Elías Amigo, y el de sus hermanos, el referido inicial del caso, evidencia escolar de los menores, toda documentación entregada por los padres de los menores al Departamento de Familia y toda documentación requerida por dicha instrumentalidad a los padres de los menores. El *subpœna* incluye material sensitivo cuya publicidad podría acarrear serias repercusiones emocionales y sociales para unos menores de edad que a tan tierna edad pasan por una etapa de gran inestabilidad. Es nuestro deber irrenunciable velar por la seguridad y estabilidad de las personas que se encuentran en situaciones de vulnerabilidad ante acciones del Estado,[32] particularmente cuando se trata de menores de edad. La Comisión también solicitó evaluaciones psicológicas y psiquiátricas de los padres de los menores.

---

[32] Véase Doe v. McMillan. 412 U.S. 306 (1973); Véanse también Rivera v. Morales Martínez, 2006 T.S.P.R. 32; Ortiz García v. Meléndez Lugo, 2005 T.S.P.R. 19; Pueblo v. Santiago Torres, 154 D.P.R. 291 (2001); Pueblo v. Arocho Soto, 137 D.P.R. 762 (1994); Rodríguez del Valle v. Corcelles Ortiz, 135 D.P.R. 834 (1994); Pueblo en interés menores R.P.S., 134 D.P.R. 123 (1993); Santa Martínez v. Ramírez Tió, 133 D.P.R. 219 (1993); Sterzinger v. Ramírez, 116 D.P.R. 762 (1985); Ortiz v. Vega, 107 D.P.R. 831(1978); Muñoz v. Torres, 75 D.P.R. 507 (1953); Valentín v. Registrador, 61 D.P.R. 218 (1942); Baba v. Rodríguez, 36 D.P.R. 502 (1927).

Como surge de los hechos de este caso que se detallan en la Sentencia, el Tribunal de Apelaciones aceptó que los padres de los niños, ni han comparecido, ni consta en los autos que se les haya emitido notificación alguna sobre el alcance de esta investigación legislativa. Si en Rullán v. Fas Alzamora, *supra*, protegimos la expectativa de intimidad sobre información contributiva e invalidamos un *subpœna* legislativo por no haber sido debidamente notificado, forzosamente debemos proceder de manera más enérgica en un caso como el de autos. Es menester resolver, en aras de salvaguardar los derechos de intimidad que nuestro ordenamiento le provee a las personas sujetas a investigaciones gubernamentales, que la Asamblea Legislativa debe notificarle a los padres de los menores acerca de la investigación que se pretende llevar a cabo. En dicha notificación se deberá explicitar la información solicitada que les atañe personalmente, de manera que puedan defenderse debidamente y vindicar sus derechos constitucionales. También se les debe notificar debidamente sobre el alcance del *subpœna* en cuanto a la información requerida de los hijos[33] sobre los cuales aún tienen patria

---

[33] Como todo individuo, los menores tienen un derecho de intimidad constitucionalmente protegido. Pueblo v. Arocho Soto, *supra*; In re Gault, 387 U.S. 1 (1967); Carey v. Population Services, 431 U.S. 678 (1977); New Jersey v. T.L.O., 469 U.S. 325 (1985).

potestad[34]. Dichas notificaciones deben cumplir con los requisitos que hemos establecido jurisprudencialmente, particularmente los esbozados en Rullán v. Fas Alzamora, *supra*.

IV

Por los fundamentos expuestos, la citación enviada al Departamento de Justicia no procede por falta de jurisdicción, ya que la Resolución núm. 2756 no delegó dicha encomienda a la Comisión. En cuanto a la citación cursada al Departamento de la Familia, este Tribunal no puede hacer cumplir el *subpœna* cursado al Departamento de Familia hasta tanto se cumpla con el requisito de notificación establecido en nuestra jurisprudencia. Por estas razones, estoy conforme con la decisión de revocar la sentencia del Tribunal de Apelaciones.

Liana Fiol Matta
Jueza Asociada

---

[34] Si bien es cierto que el Departamento de la Familia es quien tiene la custodia legal de los menores, también es cierto que no ha habido procedimiento alguno de suspensión o privación de la patria potestad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hon. José Aponte Hernández,
Presidente de la Cámara de
Representantes de Puerto Rico,
et als
        Recurridos

         v.                 CC-2006-828

Hon. Roberto Sánchez Ramos,
Secretario del Departamento de
la Familia, et als

        Peticionarios


Opinión Concurrente emitida por el Juez Asociado SEÑOR RIVERA PÉREZ


San Juan, Puerto Rico, 31 de marzo de 2008.

Concurrimos con el resultado de la Sentencia, esto es, que la citación enviada por la Comisión de Bienestar Social de la Cámara de Representantes al Departamento de Justicia es improcedente ya que la Resolución de la Cámara de Representantes Núm. 2756 no delegó dicha encomienda a la Comisión. Compartimos el criterio de la Mayoría a los efectos de que la citación cursada al Departamento de la Familia adolece vicios en la notificación de la misma que impiden su ejecución. No obstante, no compartimos algunos de los fundamentos esbozados por la Mayoría. Razón por la cual, consideramos pertinente expresarnos por

separado para destacar, plasmar y delinear unos aspectos medulares que la Sentencia aborda escuetamente en su determinación y que a nuestro juicio merecen atención más profunda.

En el caso de autos las actuaciones de la Rama Legislativa, intervienen con un derecho fundamental protegido que tienen los padres de evitar que se divulguen incidencias o detalles relacionados a su vida familiar, la crianza de sus hijos, creencias y estilo de vida. Debemos recordar que nuestra Constitución, promueve y garantiza la tolerancia y respeto a la diversidad de estilos de vida dentro de una sociedad pluralista.

Reconocida la supremacía del derecho a la intimidad como uno de los derechos de la personalidad, de índole innata y privada, inherente a la persona,[35] cualquier intromisión en la intimidad de la familia de parte del Estado, no puede subsistir si la misma no se sostiene sobre un interés apremiante, y respetando las exigencias del debido proceso de ley.

El presente recurso plantea un conflicto entre, el interés del Estado en obtener acceso a información pertinente a una investigación y el derecho constitucional de unos individuos a su intimidad. Debemos

---

[35] P.R. Tel. Co. v. Martínez, 114 D.P.R 328, 339 (1983). Citando a J. Castán Tobeñas, *Derecho civil español, común y foral,* 11ma ed., Madrid, Ed. Reus, 1971, T. I, Vol. II, pág. 325.

pues examinar la dimensión y fuerza de ambos valores dentro de la situación específica del caso ante nos.

I

Los hechos del caso, según elaborados en la Sentencia, encuentran apoyo en el expediente del Tribunal, por lo que no hay necesidad de recrearlos. Así pues, pasamos directamente a esbozar el orden normativo constitucional vigente, aplicable a la controversia planteada ante nos.

Los poderes y facultades de la Rama Legislativa nacen de las Secciones 1 y 17 del Artículo III de la Constitución de Puerto Rico.[36] Dichas disposiciones constitucionales representan sus fuentes nominales.[37]

La organización del sistema político puertorriqueño responde a un sistema republicano de gobierno dividido en tres ramas o poderes, a saber Ejecutivo, Legislativo y Judicial. El mismo está enmarcado en una democracia que reconoce los derechos fundamentales de sus ciudadanos.[38] Conforme a dicha organización democrática, corresponde a la Rama Legislativa el peso de la representación ciudadana.

Este Tribunal ha reconocido que entre las facultades y deberes de la Rama Legislativa está el fiscalizar la

---

[36] Art. III, Secs. 1 y 17, Const. E.L.A., L.P.R.A., Tomo 1.

[37] Peña Clos v. Cartagena, 114 D.P.R 576, 590 (1983).

[38] Pedro Malavet Vega, *Derechos y Libertades Constitucionales en Puerto Rico*, Ponce, Ed. Lorena, 2003, pág. 41.

ejecución de la política pública formulada por la Rama Ejecutiva y la conducta de los jefes de departamentos de esa rama de gobierno.[39] El ejercicio del Poder Legislativo de investigación depende,[40] en gran medida, de la facultad que tienen los cuerpos legislativos para citar testigos a comparecer y suministrar los documentos pertinentes a las vistas, convocadas por sus comisiones, a tenor con la delegación correspondiente del cuerpo.[41] Esta facultad de ordinario se ejerce a través de sus comisiones.[42] Sin embargo el poder de éstas no es ilimitado, irrestricto ni absoluto. Su campo de acción está limitado, al igual que toda acción del Estado, por las disposiciones constitucionales sobre la separación de poderes[43] y la Carta de Derechos.[44] Infringida cualquiera de las dos limitaciones antes mencionadas, los tribunales pueden intervenir para determinar las normas constitucionales

---

[39] Hernández Agosto v. Romero Barceló, 112 D.P.R 407, 428 (1982).

[40] En Peña Clos v. Cartagena, 114 D.P.R 576, 590 (1983) resolvimos que *"la facultad de investigar es parte inseparable de la de legislar."*

[41] Hernández Agosto v. Betancourt, 118 D.P.R 79, 84 (1986).

[42] Silva v. Hernández Agosto, 118 D.P.R 45, 66 (1986). *Véase,* además, 2 Diario de Sesiones de la Convención Constituyente, pág. 854.

[43] Kilbourn v. Thompson, 103 U.S. 168 (1880); Tenney v. Brandhove, 341 U.S. 367 (1951); Barenblatt v. U.S., 360 U.S. 109 (1959). *Véase,* además, Acevedo Vilá v. Meléndez Ortiz, 164 D.P.R ___ (2005), 2005 T.S.P.R. 79, 2005 J.T.S. 80.

[44] McGrain v. Daugherty, 273 U.S. 135 (1927); Tenney v. Brandhove, 341 U.S. 367 (1951).

mínimas que deben regir el funcionamiento de las comisiones legislativas.[45]

Ni los cuerpos y demás órganos legislativos, ni los funcionarios ejecutivos, pueden convertirse en jueces de sus propios poderes.[46] Así pues, cuando la Rama Legislativa, en la consecución de su interés en obtener acceso a información pertinente a una investigación, interviene con el derecho a la intimidad dentro del contexto del ámbito familiar, debemos evaluar los contornos del poder legislativo de investigación[47] a los fines de garantizar la debida protección de los derechos constitucionales de los ciudadanos que podrían resultar intervenidos por la misma.

Al evaluar si una comisión legislativa se extralimitó en el ejercicio de su poder de investigación, hemos adoptado los criterios establecidos en la jurisdicción federal.[48] Aplicando los mismos, hemos

---

[45] Silva v. Hernández Agosto, 118 D.P.R. 45, 57 (1986). *Véase,* además, Peña Clos v. Cartagena Ortiz 114 D.P.R. 576, (1983); Rullán v. Fas Alzamora, 2006 T.S.P.R. 5, 2006 J.T.S. 12, 166 D.P.R. ___ (2006).

[46] Peña Clos v. Cartagena Ortiz, 114 D.P.R. 576, 591 (1983). Citando a Alexander Hamilton, The Federalist, Núm. 78.

[47] Santa Aponte v. Srio. Del Senado, 105 D.P.R. 750, 759 (1977).

[48] La primera decisión que impuso ciertos límites al poder de investigación de la Rama Legislativa, específicamente al Congreso de los Estados Unidos, fue el caso de Kilbourn v. Thompson, 103 U.S. 168 (1880) donde se exigió, en el contexto de la investigación a un ciudadano privado, que la investigación debe responder a propósitos legislativos

resuelto que la investigación en cuestión debe cumplir con un propósito legislativo y con los postulados de la Constitución de Puerto Rico.[49] Así pues, debemos inquirir sobre los extremos siguientes: (1) ¿es arbitrario el uso de ese poder en el caso presente?, (2) ¿se persigue un propósito legislativo?, (3) ¿conlleva la utilización de ese poder la invasión de alguna prerrogativa ciudadana consagrada en la Carta de Derechos?[50]

## II

Cuando la Rama Legislativa en el descargo de su facultad investigativa interfiere con el derecho a la

---

definidos. Más tarde en Marshall v. Gordon, 243 U.S. 521 (1917) se delimitó un poco más el poder de investigación a los efectos de que el mismo no debe interferir con la Carta de Derechos. Dicho caso, además, reafirmó la antigua práctica judicial de no sujetar la autoridad legislativa de investigación a la intervención de los tribunales.

Ahora bien, no fue hasta el caso de McGrain v. Daugherty, 273 U.S. 135 (1927) que el Tribunal Supremo de los Estados Unidos definió los contornos del poder de investigación legislativa cuando la misma se centraba en la Rama Ejecutiva y/o en la conducta de alguno de los jefes de sus departamentos. El alto foro federal rechazó la contención del Gobierno de los Estados Unidos de que en tal situación la Comisión carecía de poder para obligar a un miembro del Gabinete a comparecer y testificar ante ella.

Finalmente en Tenney v. Brandhove, 341 U.S. 367 (1951) se limitó severamente la regla de que las investigaciones legislativas tienen que cumplir un propósito legislativo.

[49] Rullán v. Fas Alzamora, 2006 T.S.P.R. 5. *Véase,* además, Peña Clos v. Cartagena Ortiz, 114 D.P.R. 576 (1983); Santa Aponte v. Srio. Del Senado, 105 D.P.R. 750 (1977); Banco Popular, Liquidador v. Corte, 63 D.P.R. 66 (1944).

[50] Peña Clos v. Cartagena Ortiz, 114 D.P.R. 576, 591-592 (1983).

intimidad de un ciudadano en su carácter individual, el criterio que debe guiar la evaluación judicial del requerimiento de información es la identificación de determinada intrusión en la esfera de la intimidad, sobre la base de **razonabilidad, legalidad y pertinencia** de la misma.[51]

La **razonabilidad** de un requerimiento de información del poder legislativo de investigar, dependerá de la concurrencia de las circunstancias siguientes: (1) que la investigación esté dentro de la autoridad conferida por ley; (2) que el requerimiento no sea demasiado indefinido y; (3) que la información solicitada sea razonablemente pertinente al asunto específico bajo investigación.[52] La privacidad e intimidad del individuo a de ser evaluada bajo el criterio de expectativa razonable de intimidad.

La determinación de **legalidad** se hará a base de las siguientes consideraciones: (1) si el referido poder de investigación ha sido ejercido arbitrariamente, (2) si la investigación persigue un propósito legislativo,[53] (3) **si el ejercicio de ese poder invade alguna prerrogativa**

---

[51] *Véase*, Rullán v. Fas Alzamora, 2006 T.S.P.R. 6, 2006 J.T.S. 12, 166 DPR ___ (2006).

[52] *Véase*, H.M.C.A. P.R., Inc., etc. v. Contralor, 133 D.P.R. 945, 970 (1993); E.L.A. v. Puerto Rico Tel. Co., 114 D.P.R. 394, 402 (1983); P.N.P. v. Tribunal Electoral, 104 D.P.R. 741, 747-748 (1976); Comisionado de Seguros v. Bradley, 98 D.P.R. 21, 31 (1969).

[53] Rullán v. Fas Alzamora, 2006 T.S.P.R. 5, __, 2006 J.T.S. 12, 166 D.P.R. ___ (2006). Citando a Peña Clos v. Cartagena Ortiz, 114 D.P.R. 576, 591 (1983).

**ciudadana consagrada en la Carta de Derechos que lesione de alguna forma derechos individuales.**[54]

Por otro lado, la determinación de **pertinencia** se hará tomando en consideración los factores siguientes: (1) el tipo de documento requerido; (2) la información que contiene o podría contener; (3) **la posibilidad de perjuicio por cualquier divulgación subsiguiente no consentida**; (4) el daño que la divulgación pueda ocasionarle a la relación que generó los documentos; (5) la adecuacidad de las medidas encaminadas a prevenir la divulgación no autorizada; y (6) el grado de necesidad de acceso a la información y el hecho de que si existe un mandato estatutario expreso, una política pública articulada u otro interés público reconocible que milite a favor del acceso.[55]

No obstante, hemos sido enfáticos al resolver que a la hora de determinar la existencia de un interés personal e individual protegido frente a la intervención del Estado, el criterio rector será *"si la persona tiene un derecho razonable a abrigar, donde sea, dentro de las*

---

[54] *Íd*. Citando a <u>Peña Clos v. Cartagena Ortiz</u>, *supra*, págs. 586-587.

[55] <u>E.L.A. v. P. R. Tel. Co.</u>, 114 D.P.R. 394, 402 (1983). Citando a <u>United States v. Westinghouse Elec. Corp.</u>, 638 F.2d 570, 578 (3rd Cir. 1980) y a <u>Whalen v. Roe</u>, 429 U.S. 589 (1977).

*circunstancias del caso específico, la expectativa de que su intimidad se respete.*"[56]

En lo que nos atañe, hemos resuelto que cuando los requerimientos de información del Estado emitidos para obtener cierta documentación se dirigen a individuos que no son objeto de la investigación, el investigado está cobijado por la protección constitucional cuando su información se encuentra en poder de ese tercero.[57] Por ejemplo, hemos resuelto que las personas poseen un derecho de intimidad sobre la información que tengan las instituciones bancarias sobre su vida privada, sus transacciones y sus negocios.[58] El fundamento detrás de ello es que dicha información revela unos patrones y estilos de vida de cada uno de los clientes que utilizan los servicios de la institución bancaria, así como su situación económica.[59] Sostuvimos que mediante la obtención de dicha documentación se puede divulgar información de naturaleza íntima del individuo.[60] Así pues hemos resuelto que de conformidad con la protección que la Constitución

---

[56] Pueblo v. Lebrón, 108 D.P.R. 324, 331 (1979). *Véase,* además, E.L.A. v. P. R. Tel. Co., 114 D.P.R. 394, 402 (1983); Pueblo v. Loubriel, Suazo, 158 D.P.R. 371, 378 (2003).

[57] R.D.T. Const. Corp. v. Contralor I, 141 D.P.R. 424 (1996).

[58] Rullán v. Fas Alzamora, 2006 T.S.P.R. 5, 2006 J.T.S. 12, 166 D.P.R. ___(2006). Citando a R.D.T. Const. Corp. v. Contralor I, 141 D.P.R. 424 (1996).

[59] *Íd.*

[60] *Íd.*

de Puerto Rico provee a todo ciudadano contra intervenciones del Estado, ni las empresas ni los bancos tienen que presumir que los ciudadanos al proveerle información están renunciando a su expectativa de intimidad sobre la misma.[61]

Según se desprende de los precedentes antes reseñados, cuando la información requerida está en poder de un tercero, la protección judicial ante la intervención del Estado se torna indispensable por imperativo constitucional del derecho a un debido proceso de ley. En dichos casos se le encomienda a la autoridad judicial determinar y evaluar los asuntos sobre privacidad que dicho requerimiento pueda suscitar. Consecuentemente, en aquellos casos en los que las instituciones gubernamentales tengan el poder de compeler a personas naturales o jurídicas a suministrar información, sobre la cual terceros puedan abrigar un derecho a la intimidad, el ente gubernamental tiene a su haber dos mecanismos para obtener la información. En primer lugar, acudir directamente a los tribunales para obtener una orden requiriendo la entrega de la información solicitada. El rol del tribunal será el de un interventor imparcial que velará porque la información solicitada cumpla con los requisitos de autoridad legal, pertinencia y relación razonable con el objeto de la investigación.

---

[61] Rullán v. Fas Alzamora, 2006 T.S.P.R. 5, 2006 J.T.S. 12, 166 D.P.R. ___(2006). Citando a R.D.T. Const. Corp. v.

Con ello se provee suficientes garantías en contra de la arbitrariedad del pedido de la Rama Legislativa.[62] En la alternativa, si la Legislatura decide emitir una citación a las agencias pertinentes para que le entreguen la información solicitada relacionada con la investigación, deberá notificarle formalmente con **razonable anticipación** al individuo afectado por dicho requerimiento. Dicha notificación deberá contener, entre otras cosas, lo siguiente: información específica y detallada, expresando la razón, el propósito y pertinencia de la solicitud, a la luz de la investigación que se está llevando a cabo y la disposición legal que faculta a la comisión legislativa en cuestión para realizar tal requerimiento. El propósito de la notificación es dar oportunidad razonable al ciudadano investigado, que se sienta agraviado en su derecho a la intimidad, de cuestionar el requerimiento de información ante la autoridad judicial competente.[63]

Ambos mecanismos reseñados interponen al tribunal como ente neutral y adjudicador en la evaluación de la legalidad, razonabilidad y pertinencia del requerimiento

---

Contralor I, 141 D.P.R. 424, 443 (1996).
[62] En Silva v. Hernández Agosto, 118 D.P.R. 45, 57 (1986), resolvimos que los tribunales pueden intervenir para determinar las normas constitucionales mínimas que deben regir el funcionamiento de las comisiones legislativas. Añadimos además, que la determinación final de una controversia sobre la validez constitucional de una regla de una comisión legislativa corresponde a los tribunales, sin que ello constituya una indebida intromisión de la Rama Judicial en los trabajos de la Asamblea Legislativa.

legislativo en protección del derecho a la intimidad de las personas.[64]

La Sección 2 del Artículo I de la Constitución de Puerto Rico,[65] pretendió establecer un sistema de pesos y contrapesos con el propósito de crear un equilibrio dinámico entre sus poderes coordinados y de igual rango para evitar que uno amplíe su autoridad a expensas de otro.[66] El loable propósito de la separación de poderes es evitar la concentración excesiva de poder en una sola rama de gobierno y salvaguardar la independencia de cada rama, evitando que una de ellas domine o interfiera con las facultades de las otras.[67]

III

El derecho a la intimidad está garantizado por la Carta de Derechos de la Constitución de Puerto Rico en sus secciones 1, 8 y 10 del Artículo II. En lo pertinente, la

---

[63] Rullán v. Fas Alzamora, 2006 T.S.P.R. 5, 2006 J.T.S. 12, 166 D.P.R. ___ (2006).

[64] Íd.

[65] El Artículo I, Sección 2 de la Constitución de Puerto Rico dispone lo siguiente:

El gobierno del Estado Libre Asociado de Puerto Rico tendrá forma republicana y sus Poderes Legislativo, Ejecutivo y Judicial, según se establecen por ésta Constitución, estarán igualmente subordinados a la soberanía del pueblo de Puerto Rico.

Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1.

[66] Nogueras v. Hernández Colón, 127 D.P.R. 405, 412 (1990).

[67] Colón Cortés v. Pesquera, 150 D.P.R. 724, 750 (2000).

sección 1 de dicho cuerpo legal consagra el principio de la inviolabilidad de la dignidad del ser humano.[68] Por su parte, la sección 8 de dicha Carta decreta el derecho que tiene toda persona a estar protegida contra ataques abusivos a su honra, reputación, vida privada y familiar,[69] y, la sección 10 protege al ciudadano contra registros, allanamientos e incautaciones irrazonables.[70]

Las secciones 1 y 8 del Artículo II de nuestra Constitución, antes mencionadas, operan sin necesidad de una ley que las implemente.[71] Es decir que tanto el derecho a la intimidad como a la inviolabilidad de la dignidad del ser humano operan *ex propio vigore* y pueden hacerse valer aún entre personas privadas.[72] De no ser así, la intimidad y la dignidad humana quedarían supeditadas a la acción legislativa, lo que sería simplemente incongruente con el propósito de los forjadores de la Constitución y representaría una contramarcha en su evolución vindicadora.[73]

La amplitud de la sección 8 de la Carta de Derechos, *supra*, es de tal magnitud que protege la inviolabilidad

---

[68] Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1.

[69] Art. II, Sec. 8, Const. E.L.A., L.P.R.A., Tomo 1.

[70] Art. II, Sec. 10, Const. E.L.A., L.P.R.A., Tomo 1.

[71] Alberio Quiñones v. E.L.A., 90 D.P.R. 812, 816, (1964); E.L.A. v. Hermandad de Empleados, 104 D.P.R. 426 (1975).

[72] P. R. Tel. Co. Martínez Cardona, 114 D.P.R. 328, 339 (1993); Arroyo v. Rattan Specialties, Inc., 117 D.P.R. 35, 64 (1986).

personal en su forma más completa y amplia. Ello debido a que el **honor y la intimidad son valores del individuo que merecen protección cabal**, no solo frente a atentados provenientes de otros particulares, sino también **contra ingerencias abusivas de las autoridades gubernamentales**. Dicha fórmula se extiende a todo lo que es necesario para el desarrollo y expresión de la persona.[74]

La declaración constitucional de que la dignidad del ser humano es inviolable, es la afirmación relativa al principio moral de la democracia. Es el principio de que el ser humano y su dignidad constituyen la razón de ser de la justificación política.[75]

Las relaciones humanas y familiares que incluyen el matrimonio, nacimiento, crianza y cohabitación de los hijos están contenidas dentro del concepto de libertad, protegido por la Constitución de Estados Unidos.[76] Además,

---

[73] P. R. Tel. Co. v. Martínez, 114 D.P.R. 328, 340 (1983).

[74] *Véase*, Informe de la Comisión de la Carta de Derechos rendido a la Convención Constituyente, Diario de Sesiones de la Convención Constituyente, págs. 2566-2567 (1951).

[75] *Íd.*, pág. 1372.

[76] Roberts v. United States Jaycees, 468 U.S. 609 (1984). El Tribunal Supremo de los Estados Unidos resolvió en lo pertinente lo siguiente:

> The personal affiliations that exemplify these considerations, and that therefore suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection, are those that attend the creation and sustenance of a family – marriage, e.g., Zablocki v. Redhail, 434 U.S. 678 (1978); childbirth, e.g., Carey v. Population Services International, 431 U.S. 678 (1977); the raising and education of children, e.g., Smith v. Organization of

la intromisión del Estado en el ámbito de las relaciones familiares está sujeta a la protección contra ataques abusivos contra la intimidad según se consagra en el Artículo II, Sección 8 de la Constitución de Puerto Rico. Así pues, la intromisión del Estado en estas áreas sensitivas sólo puede tolerarse cuando así lo requieran factores superantes de alto interés público como la salud, seguridad pública o el derecho a la vida y la felicidad del ser humano afectado.[77]

Al determinar la extensión de la intervención gubernamental en las relaciones familiares hemos resuelto lo siguiente:

> En la sociedad democrática organizada alrededor de los derechos fundamentales del hombre, el Estado ha de reducir a un mínimo su intervención con sensitivas urdimbres emocionales como lo son las relaciones de familia. La intromisión en la vida privada solo ha de tolerarse cuando así lo requieran factores superantes de salud y seguridad pública o el derecho a la vida y a la felicidad del ser humano afectado.[78]

---

Foster Families, 431 U.S. 816 (1977); and cohabitation with one's relatives, e.g., Moore v. East Cleveland, 431 U.S. 494 (1977). Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life. Among other things, therefore, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship.

Íd., págs. 619-620.

[77] García Santiago v. Acosta, 104 D.P.R. 321, 324 (1975). Véase, además, Figueroa Ferrer v. E.L.A. 107 D.P.R. 250 (1976).

[78] García Santiago v. Acosta, 104 D.P.R. 321, 324 (1975).

El derecho y protección de la vida privada y familiar, consustancial al derecho a la intimidad y al inviolable principio de la dignidad del ser humano, protege dos intereses fundamentales. Uno es el interés individual de evitar divulgación de asuntos personales y el otro es el interés de poder tomar decisiones importantes independientemente.[79] Este derecho constitucional impone a toda persona el deber de no inmiscuirse en la vida privada o familiar de los demás seres humanos.[80] De ahí surge la dualidad de su carácter de derecho y protección tanto frente a intervenciones del Estado como de personas particulares.[81]

En _Roberts v. U.S. Jaycees_,[82] el Tribunal Supremo de los Estados Unidos reconoció la zona de intimidad que cubre las relaciones familiares como una que obedece y desempeña un rol cultural determinante, ya que propicia la transmisión de tradiciones y creencias entre las generaciones. El Estado, debe ejercer suma cautela al intervenir en la esfera familiar ya que es ahí donde los

---

[79] _Whalen v. Roe_, 429 U.S. 589, 599-600 (1977).

[80] _Colón v. Romero Barceló_, 112 D.P.R. 573, 576 (1982); _Figueroa Ferrer v. E.L.A._, 107 D.P.R. 250 (1978); _E.L.A. v. Hermandad de Empleados_, 104 D.P.R. 436 (1975).

[81] _Arroyo v. Rattan Specialties, Inc._, 117 D.P.R. 35, 75 (1986) (Opinión Concurrente y disidente emitida por el Juez Asociado Señor Hernández Denton.)

[82] 468 U.S. 609, 618-620, 622 (1984).

individuos desarrollan su identidad, la cual es un elemento esencial del concepto de libertad.

IV

El derecho a la intimidad del individuo, en algunas ocasiones se extiende a los bienes, propiedad y a la morada de la persona, y en este entorno entra en juego la protección contra registros y allanamientos instituida en la Enmienda 4 de la Constitución Federal[83] y en el Artículo II, Sección 10 de su contraparte puertorriqueña.[84] Su propósito es proteger el derecho a la intimidad y dignidad del individuo frente a actuaciones arbitrarias e irrazonables del Estado,[85] se extiende y ampara los documentos y otras pertenencias del individuo e interpone la figura del juez entre los funcionarios públicos y la ciudadanía para ofrecer mayor garantía de razonabilidad a la referida intrusión.[86]

La mera intervención del Estado con el individuo no activa automáticamente la referida protección. Para que la

---

[83] La Enmienda 4 de la Constitución de los Estados Unidos dispone lo siguiente:

The right of people to be secure in the persons, houses, papers, and effects against unreasonable searches and seizures, shall no be violated, and no Warrants shall be issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[84] Art. II, Sec. 10, Const. E.L.A., L.P.R.A., Tomo 1.

[85] Pueblo v. Loubriel, Suazo, 158 D.P.R. 371, 378 (2003). Citando a Pueblo v. Yip Berríos, 142 D.P.R. 386 (1997) y Pueblo v. Ramos Santos, 132 D.P.R. 363 (1992).

[86] E.L.A. v. Coca Cola, 115 D.P.R. 197, 207 (1998).

misma se active es necesario que el individuo afectado por la intervención del Estado disfrute una expectativa razonable de intimidad sobre el lugar y/u objeto allanado, registrado o incautado. Si el individuo no abriga una expectativa razonable de que su intimidad será respetada, no será acreedor a la protección constitucional.[87]

V

En Aponte Martínez v. Lugo,[88] expresamente indicamos que son efectivas en Puerto Rico, en lo aplicable, las garantías de la Primera Enmienda de la Constitución de los Estados Unidos que están protegidas en los estados federados por la Enmienda 14 de dicha Constitución. Añadimos que, ello lo hacíamos así por convicción propia, ya que sería ilusorio pensar que el Tribunal Supremo de los Estados Unidos no insistiría en que se protegiesen en Puerto Rico los derechos constitucionales fundamentales de los ciudadanos de los Estados Unidos.[89]

En nuestra jurisdicción, la Sección 7 del Artículo II de la Constitución de Puerto Rico consagra la Cláusula del Debido Proceso de Ley. La misma dispone que ninguna persona será privada de su libertad o propiedad sin el

---

[87] Rullán v. Fas Alzamorra, 2006 T.S.P.R. 5, 2006 J.T.S. 12, 166 D.P.R. ___ (2006).

[88] 100 D.P.R. 282, 287 (1971). Citando a R.C.A. v. Gobierno de la Capital, 91 D.P.R. 416, 427 (1964).

[89] Íd.

debido proceso de ley.[90]  Esta disposición constitucional tiene su contraparte y modelo en las Enmiendas 5 y 14 de la Constitución Federal.[91] La Cláusula del Debido Proceso de Ley de la Constitución Federal, en la cual se funda la nuestra, procura prevenir que el gobierno abuse de sus poderes, que los utilice como instrumentos de opresión, o que los ejerza de forma arbitraria en perjuicio del individuo.[92] Esta cláusula impone al Estado la obligación de garantizar que la interferencia con los intereses de libertad y propiedad del individuo se haga a través de un procedimiento que en esencia sea justo y equitativo.[93]

Es preciso señalar que las normas constitucionales federales imponen las pautas y requisitos de protección mínimos a seguir. Consecuentemente, los Estados de la Unión y Puerto Rico pueden reconocer derechos, estimados como fundamentales con mayor amplitud que en la jurisdicción federal.[94] Dichas interpretaciones no limitan nuestra facultad para reconocer mayor amplitud a las

---

[90] Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1.

[91] Rodríguez v. E.L.A., 130 D.P.R .562, 575 (1992); Rivera Santiago v. Secretario de Hacienda, 119 D.P.R. 265, 273 (1987).

[92] Rodríguez v. E.L.A., 130 D.P.R. 562, 575 (1992). *Véase*, además, Davidson v. Cannon, 474 U.S. 344, 348 (1986) Daniels v. Williams, 474 U.S. 327, 331 (1986).

[93] Rodríguez v. E.L.A., 130 D.P.R. 562, 578 (1992).

[94] Pueblo v. Muñoz, Colón, Ocasio, 131 D.P.R. 965, 982 (1992); Pueblo v. Dolce, 105 D.P.R. 422 (1976); Cooper v. California, 386 US 58 (1967).

garantías constitucionales conferidas por la Constitución de Puerto Rico.

El debido proceso de ley tiene dos dimensiones, la sustantiva y la procesal.[95] La acepción sustantiva, persigue proteger los derechos fundamentales de la persona. Por su parte, la procesal le impone al Estado la obligación de garantizar que la interferencia con los derechos de libertad y propiedad de la persona sea a través de un procedimiento que sea justo.[96]

El debido proceso de ley requiere, como regla general, la notificación o citación real y efectiva, ajustada a los preceptos estatutarios aplicables.[97] Ello responde a uno de los principios constitucionales fundamentales del debido proceso, a saber: que ninguna persona podrá ser privada de sus intereses libertarios y/o propietarios sin que previo a ello se le conceda una oportunidad de ser oído en alguna forma o procedimiento que fuere justo y razonable.[98]

El asunto específico bajo nuestra consideración requiere que examinemos con detenimiento los preceptos

---

[95] Rodríguez v. E.L.A., 130 D.P.R. 562, 575 (1992). Citando a Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1984).

[96] Rexach v. Ramírez, 162 D.P.R. __, (2004), 2004 T.S.P.R. 97, 2004 J.T.S. 103; Rodríguez v. E.L.A., 130 D.P.R. 562, 576 (1992).

[97] Residentes v. Montebello Dev. Corp., 138 D.P.R. 412, 421, (1995).

[98] J.R.T. v. Hato Rey Phychiatric Hosp., 119 D.P.R. 62, 70 (1987).

aplicables al ámbito procesal del debido proceso de ley. La aplicación de dicha vertiente requiere la existencia de un interés individual de libertad o propiedad que el Estado mediante su actuación afecte. Cumplida esta condición, procede determinar cual es el procedimiento exigido para proteger el mismo, es decir cuales son las garantías mínimas para que la persona afectada tenga un debido procedimiento.[99] El criterio esencial que gobierna el procedimiento es que el mismo sea uno justo.

Hemos establecido cual es el proceso debido al intervenir con algún derecho protegido. Al hacer dicha evaluación deben sopesarse los criterios siguientes: (1) **la naturaleza del interés individual afectado por la acción oficial**; (2) el riesgo que podría conllevar en ese caso específico una determinación errónea que prive a la persona del interés protegido mediante el proceso utilizado y el valor de garantías adicionales o distintas; y (3) el interés gubernamental del Estado al afectar dichos intereses y la posibilidad de utilizar métodos alternos.[100]

A pesar de que el derecho a la intimidad es inviolable, ya fuere por el Estado o por persona particular, el titular del mismo lo puede renunciar. Sin

---

[99] Rivera Santiago v. Srio. De Hacienda, 119 D.P.R. 265, 274-275 (1987).

[100] Rivera Rodríguez & Co. v. Lee Stowel, Etc., 133 D.P.R. 881, 888-889 (1993).

embargo, siendo un derecho constitucional de la más alta jerarquía, su **renuncia** tiene que ser **patente, específica** e **inequívoca.**[101]

VI

De nuestro historial jurisprudencial se desprende que en determinadas ocasiones en que se ha contrapuesto el derecho a la intimidad a otros de similar jerarquía, dentro del balance de intereses, hemos favorecido el mismo.[102] Hemos sido enfáticos en que el Estado, incluyendo las comisiones legislativas, no puede restringir el derecho a la intimidad sin demostrar antes la existencia de un interés apremiante que lo justifique.

En el caso de autos, está involucrado uno de los valores más preciados de nuestra sociedad como lo es el derecho a la intimidad. La familia y el hogar son dos ámbitos claramente protegidos por ese derecho. La intimidad y privacidad de la vida familiar de un individuo no pueden ser perturbadas mediante una intromisión irrazonable del Estado, en ausencia de un interés apremiante. El Estado viene obligado a asegurarle a todo ciudadano el pleno disfrute del estilo y composición familiar de su preferencia.

---

[101] P.R. Tel. Co. v. Martínez, 114 D.P.R. 328, 343 (1983).

[102] *Íd.*, pág. 339. Así, por ejemplo, ha prevalecido ante los siguientes derechos fundamentales: de libre expresión frente a la residencia del Secretario del Trabajo; de libertad de culto, y de propiedad.

Concluimos por tanto que la familia Elías Amigo, objetos de la investigación de la Comisión de Bienestar Social de la Cámara de Representantes, tenían una expectativa razonable de intimidad sobre los documentos que obran en los expedientes sobre maltrato de menores custodiados por el Departamento de la Familia y por el Departamento de Justicia. Dicha expectativa razonable de intimidad, que cobija a toda persona, no desaparece ante la existencia de una ley o cuerpo reglamentario que autorice su divulgación, sin protegerse las garantías constitucionales reconocidas en nuestro ordenamiento jurídico.[103] Toda información recopilada en cumplimiento de una obligación impuesta por ley, incluyendo documentación, exámenes, evaluaciones médicas, siquiátricas, sicológicas, entre otras, recopiladas por las agencias estatales relacionada con menores de edad que sean objeto de investigación o intervención por parte del Departamento de la Familia, el Departamento de Justicia y otras agencias, como parte de una investigación al amparo de la Ley Núm. 177,[104] "Ley para el Bienestar y Protección de Integral de la Niñez", tiene una utilidad y propósito específico y limitado.[105] Razón por la cual los menores sujetos a dicha

---

[103] *Véase*, Rullán v. Fas Alzamora, 2006 T.S.P.R. 5, 2006 J.T.S. 12, 166 D.P.R. ___(2006).

[104] Ley Núm. 177 de 1 de agosto de 2003, según enmendada, conocida como la *Ley para el Bienestar y Protección de Integral de la Niñez*. 8 L.P.R.A. Sección 446 (f).

[105] *Véase*, Rullán v. Fas Alzamora, 2006 T.S.P.R. 5, 2006 J.T.S. 12, 166 D.P.R. ___(2006).

intervención o investigación, ni sus padres en el presente caso **renunciaron de forma alguna** a su expectativa de intimidad respecto a la información contenida en dichos expedientes.[106] La expectativa de intimidad sobre la retenida información es independiente a la autoridad del cuerpo legislativo para intervenir con la misma como parte de su facultad investigativa.[107]

Por tanto, la Comisión de Bienestar Social de la Cámara de Representantes, previo a obtener cualquier documento, expediente y/o información custodiada por el Departamento de la Familia y el Departamento de Justicia, relacionada al caso del niño Mathew Elías Amigo, sus hermanos y demás partes envueltas, tiene la obligación de notificarle a éstos sus pretensiones con razonable antelación, para brindarles la oportunidad de cuestionar dicho requerimiento ante la autoridad judicial competente, de sentirse agraviados. En la alternativa, pueden acudir al tribunal competente para obtener una autorización judicial que ordene la entrega de la información solicitada, una vez que dicho foro haya evaluado la legalidad, razonabilidad y pertinencia del requerimiento.

---

[106] No se dan los requisitos de la renuncia al derecho a la intimidad, a saber, que la misma sea patente específica e inequívoca.

[107] <u>Nixon v. Administrator General Services</u>, 433 U.S. 425, 458 (1977). ("The expectation is independent of the ownership of the materials".)

En cualquiera de las dos instancias, la notificación al ciudadano es requisito indispensable.[108]

No surge del expediente de autos que los padres del menor Mathew Elías Amigo fueran notificados de forma alguna sobre la intención ni el alcance de los requerimientos de información cursados por la Comisión de Bienestar Social de la Cámara de Representantes. Peor aún, el propio Tribunal de Apelaciones en su dictamen parece sugerir que en ausencia de un reclamo de confidencialidad por parte de la familia Elías Amigo, el derecho a la intimidad no se activa. ¿Acaso el derecho a la intimidad como a la inviolabilidad de la dignidad del ser humano no operan *ex propio vigore*? ¿No es acaso el criterio determinante la expectativa de intimidad? ¿Acaso la renuncia al derecho a la intimidad no debe ser específica, inequívoca y patente? ¿Cómo iba a reclamar la familia Elías Amigo la expectativa de intimidad que albergaban sobre la información solicitada, si desconocían que eran objeto de una pesquisa legislativa? ¿No es acaso el propósito de la notificación el darle la oportunidad a quien posee una expectativa de intimidad sobre cierta información que se encuentra en manos de un tercero, el que puedan levantar las defensas, objeciones y argumentos que estimen pertinentes? Contestamos dichas interrogantes en la afirmativa.

---

[108] <u>Rullán v. Fas Alzamora</u>, 2006 T.S.P.R. 5, 2006 J.T.S. 12, 166 D.P.R. ___(2006).

En aras de salvaguardar el derecho a la intimidad de la familia Elías Amigo ante la investigación legislativa en su contra, estimamos además, que como mínimo, la notificación que en su día se le curse, deberá informar la razón, propósito y pertinencia de la solicitud, a la luz de la investigación que se está llevando a cabo y la disposición legal que faculta a la comisión legislativa en cuestión para realizar tal requerimiento.[109] Esto es imprescindible por imperativo del derecho constitucional a un debido proceso de ley. No podemos pretender que el propósito y legalidad de la investigación legislativa, así como la pertinencia, materialidad, razonabilidad de la información solicitada se deduzca de la información requerida.

La Resolución de la Cámara de Representantes Núm. 2756 ni ninguna otra disposición legal pertinente, ofrece procedimiento alguno que pueda ser utilizado para determinar la pertinencia y razonabilidad del requerimiento, ni velar porque el mismo no sea arbitrario.[110] Razón por la cual la intervención judicial era imperiosa. Recordemos que las normas constitucionales o reglamentarias van dirigidas a proteger la intimidad de la persona. Para armonizar el derecho a la intimidad que tiene todo individuo, con el fundamental interés del Estado de poner en vigor las leyes, se le encomienda a la

---

[109] *Íd.*

autoridad judicial determinar cuando puede el Estado legítimamente intervenir con el ámbito de intimidad del individuo.[111]

En ausencia de una determinación judicial sobre la razonabilidad, legalidad y pertinencia de la citación o, de una razonable y oportuna notificación a los padres de los menores sobre la investigación que se pretende llevar a cabo, es forzoso concluir, que la citación cursada al Departamento de la Familia adolece de un vicio constitucional que impide su ejecución.

En cuanto a la citación cursada al Departamento de Justicia, como bien concluye la Sentencia, no procede la misma por no estar ceñida al texto de la Resolución de la Cámara de Representantes Núm. 2756.[112] La Mayoría fundamenta su decisión en que la Resolución de la Cámara de Representantes Núm. 2756 adolece de especificidad.

Existe aquí la posibilidad de perjuicio indebido e irrazonable por una divulgación (de información) no consentida.[113] Aquí está envuelta la dignidad e

---

[110] *Íd.*

[111] Pueblo v. Muñoz, Colón, Ocasio, 131 D.P.R. 965 (1992).

[112] En Hernández Agosto v. Betancourt, 118 D.P.R. 79, 84-85 (1986) resolvimos que las comisiones solo pueden dedicarse a investigar aquello que se les asigne mediante una resolución debidamente autorizada. *Véase,* además, Watkins v. U.S., 354 U.S. 178 (1975); Sinclair v. United States, 279 U.S. 263 (1929); Kilbourn v. Thompson, 103 U.S. 168 (1880).

[113] Cabe señalar que entre los documentos solicitados al Departamento de la Familia por la Comisión de Bienestar Social estaban los siguientes: documentos personales y

inviolabilidad de unos menores que están atravesando una azarosa trayectoria personal y familiar, fueron removidos de la custodia de sus padres biológicos, sufrieron el deceso de dos (2) de sus hermanos y se han visto forzados a múltiples ajustes físicos y emocionales a tan corta edad. Éstos y otros detalles e incidencias relacionados a su situación personal y familiar no deben agravarse exponiéndolos irrazonable e indebidamente a un escrutinio público todavía mayor al que ya se han visto sometidos, mediante la divulgación de la información confidencial incluida en sus expedientes. La razonabilidad de la intervención legislativa, dependerá del balance entre el interés público de obtener información pertinente que le permita al Estado anticipar y evitar situaciones de maltrato de menores y el derecho de la familia Elías Amigo a su intimidad e integridad, libre de interferencias indebidas por parte del Estado.[114]

Este caso pone de manifiesto la necesidad de que los tribunales intervengan para proteger y salvaguardar la tranquilidad de un hogar[115] y para proteger a un ciudadano de sufrir la divulgación de información que pueda

---

confidenciales de los menores, sus análisis psicológicos, los informes administrativos relacionados a las intervenciones del Estado, sus expedientes escolares y sus informes médicos, entre otra documentación.

[114] Pueblo v. interés del menor N.R.O., 136 D.P.R. 949, 964 (1994).

[115] Véase, Sucn. De Victoria v. Iglesia Pentecostal, 102 D.P.R. 20 (1974); E.L.A. v. Hermandad de Empleados, 104 D.P.R. 436 (1975).

constituir una irrazonable e indebida intromisión en su vida familiar.[116] Debemos garantizar que la Asamblea Legislativa, en el descargo de su poder constitucional, no utilice sus prerrogativas en forma inapropiada e irrazonable sobre el ciudadano ni que sea juez y parte de sus facultades, en su ejercicio sobre el individuo.[117]

El fin de la Constitución de Puerto Rico es la convivencia social con respeto y justicia para todos[118] y, el de nosotros, como su intérprete máximo, asegurar la consecución de sus fines. Su vitalidad descansa en su dinamismo.[119] Nuestra decisión no es incompatible con las garantías que un Estado democrático debe a sus ciudadanos.[120] De este modo atemperamos nuestra Constitución a la realidad de los cambios sociales a los que se supone que sirva.

*Efraín E. Rivera Pérez*

---

[116] Colón v. Romero Barceló, 112 D.P.R. 573 (1982).

[117] Rullán v. Fas Alzamora, 2006 T.S.P.R. 5, 2006 J.T.S. 12, 166 D.P.R. ___ (2006).

[118] P.R. Tel. Co. v. Martínez, 114 D.P.R. 328, 350 (1983).

[119] *Íd.*

[120] *Íd.*

*Juez Asociado*

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Hon. José Aponte Hernández, | * | |
| Presidente de la Cámara de | * | |
| Representantes de Puerto Rico; | * | |
| y Hon. Rolando Crespo Arroyo, | * | |
| Presidente de la Comisión de | * | |
| Bienestar Social de la Cámara | * | |
| de Representantes | * | |
| | * | |
|    Recurridos | * | CC-2006-828 |
| | * | |
|           v. | * | *Certiorari* |
| | * | |
| Hon. Roberto Sánchez Ramos, | * | |
| Secretario de Justicia; | * | |
| Hon. Félix Matos Rodríguez, | * | |
| Secretario del Departamento | * | |
| de la Familia; Hon. Yolanda | * | |
| Zayas Santana, ex Secretaria | * | |
| del Departamento de la Familia | * | |
| | * | |
|    Peticionarios | * | |

*******************************

Opinión Disidente del JUEZ PRESIDENTE SEÑOR HERNÁNDEZ DENTON


San Juan, Puerto Rico, a 31 de marzo de 2008.

En Peña Clos v. Cartagena Ortiz, 114 D.P.R. 576, 598 (1983), rechazamos que en nuestro sistema constitucional de gobierno la Rama Ejecutiva pueda instituirse como la exclusiva protectora de la confidencialidad. En aquella ocasión, una comisión senatorial solicitó de la Policía de Puerto Rico una serie de documentos relacionados con el notorio "Caso del Cerro Maravilla", mas el Superintendente de la Policía se los negó por supuestamente ser confidenciales. Tras analizar detenidamente el asunto, **esta Curia ordenó su entrega.**

A pesar de las contundentes expresiones que hiciéramos en aquella ocasión, la Sentencia emitida por el Tribunal en el caso de epígrafe se aparta de forma inusitada de la norma

allí establecida. De esa manera, impide que la Comisión de Bienestar Social de la Cámara de Representantes investigue el manejo que el Departamento de la Familia hiciera de la situación en torno a la muerte de uno de los hijos del Sr. William Elías Rodríguez. Por estimar que dicha Sentencia es claramente incompatible con la doctrina constitucional que por años hemos enunciado acerca del amplio poder investigativo de la Asamblea Legislativa, *respetuosamente disentimos*.

I.

Desde hace décadas resolvimos con suma claridad que el poder investigativo de la Asamblea Legislativa *es amplio, pero no absoluto*. Véanse, e.g., <u>Hernández Agosto v. Betancourt</u>, 118 D.P.R. 79, 81-82 (1986); <u>Peña Clos</u>, *supra*, págs. 586-87. De hecho, en <u>Peña Clos</u>, *supra*, págs. 591-92, indicamos —articulando los criterios típicos del llamado análisis tradicional— que en circunstancias como las de autos, los tribunales deben determinar si el uso del poder investigativo es arbitrario; si éste persigue un propósito legislativo; y si no invade las garantías constitucionales de los ciudadanos. En consecuencia, bajo tal criterio los tribunales no sopesan los intereses en conflicto, por lo que no es necesario determinar si pesa más el poder investigativo que el valor "protegido" por el reclamo de confidencialidad. Sin embargo, la Sentencia del Tribunal incide al no aplicar correctamente el mencionado estándar.

Por un lado, la Sentencia resuelve incorrectamente que no procede la citación al Departamento de Justicia, pues la resolución que ordena a la Comisión de Bienestar Social investigar la muerte del hijo del señor Elías Rodríguez no

le confiere dicha encomienda. La referida resolución reza:

> Se ordena a la Comisión de Bienestar Social de la Cámara de Representantes de Puerto Rico *realizar una investigación en torno a los procedimientos seguidos por el Departamento de la Familia en el caso del niño Matthew Elías Amigo y sus hermanos.*
>
> La Comisión de Bienestar Social someterá a la Cámara de Representantes un informe contentivo de sus hallazgos, conclusiones y aquellas recomendaciones que estime pertinentes, incluyendo las acciones legislativas y administrativas que deban adoptarse con relación al asunto objeto de esta investigación, dentro de los sesenta (60) días, después de aprobarse esta Resolución. R. de la C. 2756, 13 de septiembre de 2005, 15ta Asamblea Legislativa, 2da Sesión Ord. (énfasis suplido).

Según la resolución citada, "el lamentable deceso de[l niño] ha destapado una serie de sucesos que ponen en entredicho el trabajo del Departamento de la Familia y del Registro Demográfico de Puerto Rico". En apretada síntesis, la resolución expresa también que el propósito de la pesquisa es determinar si el Estado fue negligente en atender el caso del menor fallecido, si recabó la información necesaria y si realizó las investigaciones de rigor sobre el bienestar del menor antes de su muerte.

De lo anterior se desprende que la resolución citada no contiene ninguna mención del Departamento de Justicia. No obstante, ello no impide que se reconozca la facultad de la Comisión de Bienestar Social para solicitarle información a dicha agencia. Como es sabido, el requisito de que toda investigación legislativa sea previamente autorizada tiene

profundo arraigo, tanto en Puerto Rico como en la jurisdicción federal. Véanse, en Puerto Rico, Hernández Agosto v. Betancourt, *supra*, pág. 84; Peña Clos, *supra*,

págs. 584-87; en Estados Unidos, a modo persuasivo, Barenblatt v. United States, 360 U.S. 109 (1959); Watkins v. United States, 354 U.S. 179, 206 (1957). Sin embargo, como Barenblatt indica, dada la amplitud del poder parlamentario de investigación, rara vez se invalidará una pesquisa si puede interpretarse **razonablemente** que ésta tiene apoyo en la resolución que la autoriza. Véase R. D. Rotunda y J. E. Nowak, Treatise on Constitutional Law, 4ta ed., West, 2007, vol. 1, sec. 8.4(c), págs. 1011-12.

Al negarle autoridad a la Comisión de Bienestar Social para citar al Departamento de Justicia, la Sentencia del Tribunal ignora que "el apropiado significado de una autorización dada a un comité legislativo no puede derivarse tan sólo de los términos abstractos utilizados [en ésta] sin relacionarlos con el contenido definitorio provisto por el curso de las acciones legislativas". Barenblatt, *supra*, pág. 117. De esa forma, la Sentencia aludida se apega a un rigor textualista que no armoniza las distintas disposiciones aplicables y que no responde a la doctrina constitucional sobre la amplitud del poder investigativo de la Asamblea Legislativa.

Nótese que, por un lado, el Reglamento de la Cámara de Representantes ordena remitir a cada comisión aquellos asuntos que estén enmarcados en el ámbito de su particular competencia. Regla 11.2, Reglamento de la Cámara de

Representantes de Puerto Rico. Según la Regla 13.1 del citado reglamento, las comisiones permanentes —siendo una de ellas la Comisión de Bienestar Social— tienen el poder de "investigar […] *asuntos* relacionados con su

jurisdicción[, así como] revisar y ejercer supervisión continua sobre la implantación y administración de todas aquellas *leyes* que respondan a los asuntos incluidos en su jurisdicción" (énfasis suplido). A esos efectos, se les da la facultad de solicitar documentos y citar testigos de ser necesario para descargar sus funciones parlamentarias.

Por otro lado, el Reglamento de la Comisión de Bienestar Social dispone que dicho cuerpo tendrá autoridad para tratar **asuntos** relacionados con el bienestar de menores de edad. Sección 2.2, Reglamento de la Comisión de Bienestar Social. Por último, el reglamento de la Comisión le reconoce facultades para evaluar y velar "por el buen funcionamiento de aquellas agencias, departamentos, oficinas, juntas, corporaciones públicas, municipios y demás entidades del gobierno [para] determinar si [éstas] cumplen efectivamente con las leyes y reglamentos aprobados" sobre el bienestar social y familiar.

Tras analizar detenidamente el texto de ambos cuerpos reglamentarios, así como otras normas pertinentes, somos del criterio que éstos no circunscriben la autoridad de la Comisión de Bienestar Social a requerir información solamente al Departamento de la Familia. Si bien es cierto que la resolución que autoriza la investigación de marras se refiere únicamente a dicha dependencia y al Registro

Demográfico, lo cierto es que le confiere facultad para **investigar los procesos allí realizados en el caso del menor fallecido.** Sin duda, tal encomienda no limita la posibilidad de obtener información de entidades distintas al propio investigado, cuando el fin sea evaluar el desempeño de éste.

Claramente, una cosa es quién es el foco de la investigación —el Departamento de la Familia— y otra muy diferente es cómo se investiga a dicha entidad.

Así, pues, la referida Comisión tiene poder para investigar **asuntos** relacionados con el maltrato infantil, además de velar por la administración de las **leyes** sobre las que tiene competencia. Lógicamente, la jurisdicción de la Comisión de Bienestar Social está delimitada por un criterio material, no por normas organizacionales rígidas. Es decir, la competencia de la Comisión se extiende sobre **asuntos relacionados a la familia y la sociedad, no sólo sobre unas agencias en particular**. Forzosamente, en su investigación del Departamento de la Familia, la Comisión tiene que contar con la facultad de solicitar información de otras entidades que puedan arrojar luz sobre la manera en que la agencia bajo investigación ha descargado sus responsabilidades.

A una conclusión similar llegó el Tribunal Supremo federal en McGrain v. Daugherty, 273 U.S. 135 (1927), cuando en el curso de una investigación contra un ex Secretario de Justicia, el Senado estadounidense citó bajo apercibimiento de desacato a su hermano. El Senado investigaba por qué una serie de personas implicadas en actividades contrarias a la ley antimonopolios no habían sido acusadas por Justicia federal. Para ello, requirió la comparecencia del hermano, quien en aquel momento era presidente de un banco, y el Tribunal Supremo federal resolvió que podía citarlo.

Ahora bien, nuestra posición *no* implica que la Comisión de Bienestar Social pueda requerir la producción de *todo* documento en poder del Departamento de Justicia.

Más bien, somos del criterio que la entrega de la información solicitada debe regirse estrictamente por un criterio de pertinencia. Si el Departamento de Justicia objeta la pertinencia de esa información, entonces le corresponderá a un tribunal determinar si procede su entrega. **Esa evaluación judicial debe dar debida protección a aquella información cuya divulgación pueda poner en riesgo la vida o seguridad de confidentes, la integridad de técnicas investigativas o la facultad acusatoria exclusiva de la Rama Ejecutiva. Sin embargo, excluir del todo la posibilidad de dicha entrega no es la mejor forma de armonizar los intereses en pugna.**

A pesar de ello, el proceder de la Sentencia del Tribunal consiste, precisamente, en concluir sin más que la Comisión no tiene autoridad para requerirle documentos o información al Departamento de Justicia. Por tal razón, estamos forzados a discrepar de ese curso de acción y, en su lugar, reconoceríamos la autoridad de la Comisión para solicitar información a dicho Departamento, sujeto al análisis ulterior correspondiente. Cf. <u>Colón Cabrera v. Caribbean Petroleum Corp.</u>, 2007 T.S.P.R. 48, res. 16 de marzo de 2007 (sobre los límites al acceso de *ciudadanos* a información pública de carácter confidencial).

II.

Por otro lado, la Sentencia del Tribunal deja sin efecto la citación cursada por la Comisión de Bienestar Social de la Cámara de Representantes al Departamento de la Familia por alegadamente adolecer de vicios en su notificación. Sin duda, dicha determinación parte de la premisa de que en este caso se debió notificar a la familia

Elías Rodríguez de la investigación realizada por la referida Comisión. A su vez, dicha conclusión pasa por alto que la investigación aludida **no** está enfocada en la familia del señor Elías Rodríguez.

Ciertamente, la muerte del hijo menor de esta familia ha dado lugar a la investigación en cuestión. No obstante, el propio texto de la resolución que la autoriza claramente expresa que la pesquisa está dirigida al desempeño de una agencia del Ejecutivo y no a las actividades de unos ciudadanos en particular. Es decir, **en ésta no se señala a los padres del menor fallecido como partes investigadas.**

A pesar de esta innegable realidad, **la Sentencia del Tribunal le impide a la Asamblea Legislativa examinar los documentos solicitados bajo el fundamento de vicios en la notificación.** Este resultado no es cónsono con la distinción fundamental entre investigaciones legislativas realizadas a agencias de la Rama Ejecutiva e investigaciones a personas privadas. De conformidad con ello, en Peña Clos, *supra*, **resolvimos que si la investigación se dirige a una agencia o funcionario público, los tribunales deben ser cuidadosos al intervenir con la pesquisa legislativa.** De ordinario, los motivos de la investigación no pueden ser cuestionados en los tribunales. Más bien, se considera que la intervención judicial es apropiada, únicamente, cuando se han usurpado incuestionablemente las facultades de otra rama de gobierno.

Somos conscientes de que en Rullán v. Fas Alzamora, 2006 T.S.P.R. 5, res. 13 de enero de 2006, se le impuso a la Rama Legislativa un requisito de notificación en el

contexto del pedido de copia de las planillas contributivas de un **individuo investigado** por una comisión legislativa. Sin embargo, como hemos visto, el caso de autos nos presenta una cuestión esencialmente distinta. **La Familia Elías no es objeto de investigación alguna por parte de la Comisión de Bienestar Social**. En cambio, el licenciado Rullán sí era parte en la investigación que realizaba la comisión senatorial. Por eso, en ese caso la notificación estaba dirigida más a garantizarle un debido proceso de ley al licenciado Rullán, por ser objeto de una investigación sobre alegados actos de corrupción relacionados con la Corporación de Puerto Rico para la Radiodifusión Pública.

De otro lado, hemos sido consistentes en expresar que la cuestión a dilucidar cuando del derecho a la intimidad se trata es "si la persona tiene un derecho razonable a abrigar, donde sea, dentro de las circunstancias del caso específico, la expectativa de que su intimidad se respete". Pueblo v. Lebrón, 108 D.P.R. 324, 331 (1979). Así, pues, resolvimos en E.L.A. v. Puerto Rico Telephone, 114 D.P.R. 394 (1983), que los usuarios de la Telefónica no albergaban una expectativa razonable de intimidad sobre la información de sus números telefónicos, aunque firmaran un acuerdo de privacidad con la empresa. Intereses de superior jerarquía, como una investigación realizada por el Departamento de Justicia sobre prácticas monopolísticas, rebasaban el limitado derecho de intimidad de aquellos usuarios.

Además, en Pueblo v. Domínguez Fraguada, 105 D.P.R. 537 (1977), expresamos que un acusado no puede oponer un derecho de intimidad sobre fotografías que obran en los expedientes del Departamento de Transportación y Obras Públicas para

evitar que se le identifique mediante ellas en una investigación criminal. Véase también Pueblo v. Yip Berríos, 142 D.P.R. 386 (1997). A su vez, en Pueblo v. Loubriel, Suazo, 158 D.P.R. 371 (2003), resolvimos que no se infringe la expectativa de intimidad que posee una persona sobre sus cuentas bancarias cuando el Estado procura información sobre dónde fue depositado un cheque que el propio gobierno emitió. Es evidente que nuestra negativa a reconocer una amplia aplicación del derecho de intimidad en los casos antes citados se basa en el entendido de que la información en cuestión no fue generada por el individuo o fue entregada sin reservas por éste al Estado. Véanse, a modo comparativo, Katz v. United States, 389 U.S. 347, 351-52; United States v. Dionisio, 410 U.S. 1, 14 (1973).

De esta forma, cuando una persona entrega de manera voluntaria cierta información al gobierno, no puede reclamar un derecho de intimidad absoluto sobre ésta. Tampoco puede argumentar que tiene un interés de control absoluto sobre la información recopilada legítimamente por el Estado en el curso de una investigación. En síntesis, cuando se ha perdido determinado interés de privacidad, ya no puede invocarse la protección del derecho a la intimidad. Interpretar la norma pautada en Rullán de forma incompatible con lo señalado, implicaría dar un giro rotundo en nuestra doctrina sobre registros y allanamientos. Véase E. L. Chiesa Aponte, Derecho Procesal Penal: Etapa Investigativa, Pubs. J.T.S., 2006, San Juan, sec. 4.18(c), págs. 251-53 (sobre algunas de las implicaciones de la norma pautada en Rullán).

Más aún, reconocer al Ejecutivo como el único custodio

de la confidencialidad de los documentos es anatema a los principios democráticos que inspiran un sistema de gobierno en el que las distintas funciones gubernamentales son desempeñadas por tres poderes de igual rango y categoría. Véase Peña Clos, *supra*, pág. 598. En este caso, existen otros medios para evitar la divulgación pública de la información solicitada por la Comisión de Bienestar Social.

Por ejemplo, en el dictamen recurrido, el Tribunal de Apelaciones identificó una excepción a la norma de confidencialidad invocada por el           Estado. La propia Ley para el Bienestar y la Protección Integral de la Niñez, 8 L.P.R.A. sec. 446e, **permite el acceso a documentos confidenciales cuando se realiza una investigación *bona fide*.** Las normas cautelares establecidas en esa ley, vistas a la luz del poder *constitucional* de investigación que posee la Asamblea Legislativa, protegen adecuadamente los intereses que aduce el Gobierno para       negar la información solicitada. Además, no podemos olvidar que esos intereses no son exclusivos de la Rama Ejecutiva.

En esa dirección, la Cámara de Representantes ha establecido un procedimiento dirigido a salvaguardar la confidencialidad de documentos sensitivos recibidos por sus comisiones en el curso de investigaciones legislativas. Así, el Reglamento de la Cámara de Representantes dispone:

> Todo documento que se reciba bajo un reclamo justificado de confidencialidad **no formará parte de los expedientes públicos de la Comisión que los reciba**, excepto cuando medie decisión del Cuerpo en contrario. Al finalizar los trabajos de la Comisión que conllevaron la presentación de documentos confidenciales, estos serán de inmediato devueltos a su lugar de

> origen o destruidos, según se acuerde con su dueño o custodio legal, observando en todo momento aquellos protocolos que mejor garanticen la protección de los derechos involucrados. Regla 13.4 del Reglamento de la Cámara de Representantes, *supra* (énfasis suplido).

De la disposición transcrita surge claramente que la Cámara de Representantes posee un sistema adecuado para proteger el derecho de intimidad de ciudadanos como los miembros de la Familia Elías. Por tanto, el derecho a la intimidad tampoco puede ser el fundamento para negarle a la Comisión de Bienestar Social el acceso a los documentos que necesita para concretar su investigación. Claramente, en estas circunstancias, **resulta innecesario "advertir" al ciudadano sobre un "registro", cuando el propio Estado ya posee la información que se pretende proteger**.

Por último, debe quedar claro que no somos insensibles a los riesgos que puede conllevar la entrega de la información en cuestión. Sin embargo, nos rehusamos a creer que esa "entrega" significa necesariamente la "divulgación" de los datos solicitados. De ser ese último el caso, llegado el momento en que se presente una clara lesión a la integridad y dignidad de la Familia Elías, entonces nos corresponderá fijar la responsabilidad de rigor. No obstante, en este momento, cualquier acción que tomemos no tendría mayor efecto que intentar prevenir la ocurrencia de un daño remoto y especulativo a costa del amplio poder investigativo de una de las ramas que componen la democracia puertorriqueña. Por ende, disentimos.

Federico Hernández Denton

                                                    Juez Presidente